[No. 3121. Decided May 9, 1899.]

BENJAMIN F. WISEMAN, *Appellant*, v. THOMAS R. EASTMAN *et al., Respondents*.

NOTICE OF APPEAL—TO WHOM GIVEN—INTERVENORS.

Notice of appeal need not be given to one who has attempted to intervene in a cause, but who has failed to obtain leave of court

to file his complaint, as required by Bal. Code, § 4846.

PUBLIC LANDS—JUDICIAL ACTS OF LAND DEPARTMENT—REVIEW—MISTAKE OF LAW.

A mistake or misconstruction of law on the part of the United States Land Department, which will authorize a review of its decisions by the courts, must be clearly manifest and not founded upon a possible finding of the facts different from that put upon them by the department.

SAME—REVIEW OF QUESTIONS OF FRAUD.

Merely proffering false evidence before the United States Land Department as to matters litigated before it does not constitute such a fraud as entitles the courts to interfere with the decisions of the department; but the fraud which authorizes interference by the courts must be extrinsic or collateral to the matter tried by the department.

SAME—REVIEW OF QUESTIONS OF FACT.

The courts cannot review the decisions of the United States Land Department on the ground that the evidence was insufficient, or that only incompetent evidence was before it, as the power to try questions of fact necessarily embraces the power to pass upon the weight and competency of evidence.

SAME—COMPULSORY ATTENDANCE OF WITNESSES BEFORE LAND DEPARTMENT.

That the rules of the United States Land Department do not provide for the compulsory attendance of witnesses in contest cases does not authorize interference by the courts with a decision of such department, as Congress, having power under the constitution to make all needful rules and regulations respecting public land, and having organized the land department for that purpose, without authorizing it to compel the attendance of witnesses, will be presumed to have concluded that the power was unnecessary to secure a correct determination of such contest.

SAME—FORFEITURE OF RAILROAD GRANT—RIGHTS OF LICENSEES OF RAILROAD COMPANY.

One who purchased and improved land granted to the Northern Pacific Railroad Company, and received from his vendor a. postal card from the company acknowledging the receipt of his application to purchase, stating that the same had been placed on file, and briefly describing the character of settlement or improvement necessary to be made in order to obtain a preference right of purchase from the company, will, independently of any rights the vendor may have had, be deemed to nave been a licensee of the company within the forfeiture act of September 29, 1890, providing

that any citizen in possession of any lands thereby resumed by the United States, under deed, written contract with, or license from, the state or corporation to which the grant was made, shall have a preference right to purchase the same from the United States, where he caused the land to be fenced and plowed, and cropped it for several years, and had possession thereof by a tenant, it further appearing by a resolution of the company that such persons would have been deemed by it to be licensees, if the land had not been forfeited.

SAME—PREFERENCE RIGHT OF PURCHASE—WHAT CONSTITUTES POSSESSION.

The phrase "are in possession," in the forfeiture act of September 29, 1890, providing for the relief of citizens who "are in possession" of land "hereby" resumed by the United States, under deed, written contract with, or license from, the state or corporation to which the grant was made, and of persons who have settled the land with *bona fide* intent to secure title thereto by purchase from the state or corporation when earned, does not, in case of licensees, contemplate an actual settlement; but possession by a tenant is sufficient.

SAME—JURISDICTION OF LAND DEPARTMENT OVER CONTESTS.

The general power conferred upon the United States Land Department is sufficient to give it jurisdiction of contests arising under the provisions of the forfeiture act of September 29, 1890, securing a preference right of purchase to licensees from the state or corporation to which the land had been granted, or settlers upon such land, notwithstanding that the causes of contest prescribed by Rev. St. U. S., § 2297, do not include those based on such preferential right.

Appeal from Superior Court, Walla Walla County.— Hon. THOMAS H. BRENTS, Judge.    Affirmed.

*Edgar Lemman,* for appellant.

*Thomas & Dovell,* and *B. L. & J. L. Sharpstein,* for respondents.

*Lester S. Wilson,* for intervenor.

The opinion of the court was delivered by

FULLERTON, J.—The appellant, who was plaintiff be-

low, brought this action in the superior court of Walla Walla county against the respondents to charge them as trustees of certain lands situated in that county, and to compel a conveyance of the same to himself.   The court below sustained a demurrer to the original complaint of appellant, and demurrers to his amended complaints severally, up to and including the third, upon which the appellant elected to stand.   Thereupon judgment for costs and of dismissal was entered.   From that judgment this appeal is taken.

The respondent moves to dismiss the appeal, and a motion to dismiss is also filed by one John Dooly, appearing here specially for that purpose, who claims to be an intervenor in the case.   It appears by the record, that, after the action was commenced, and while a demurrer was pending to the original complaint in the court below, the purported intervenor served upon the appellant a complaint in intervention, claiming an interest in the lands in question adverse to the claims of all of the original parties to the action.   The record does not disclose that the lower court made any order permitting an intervention in the action, although the complaint in intervention recites that leave to intervene was first had.   Immediately after the service upon him of the complaint in intervention, the appellant served and filed a demurrer thereto, and the matter was suffered to rest, without further action by either of the parties, while the contest was being waged between the appellant and the respondents over the sufficiency of the original complaint and the sundry amended complaints of the appellant.   After the judgment upon the demurrer was entered, but prior to the time the notice of appeal therefrom was served, the original complaint in intervention was filed.   The record further shows that an amended complaint in intervention was filed at some time after the notice of appeal was served and filed, and that

the appellant thereupon moved to strike from the files of the cause both of the complaints, which motion, after hearing, was allowed by the court.

The notice of appeal was not served upon the purported intervenor, and it is for this reason that a dismissal of the appeal is asked.   The respondents contend that by demurring to the complaint in intervention the appellant waived his right to object that the intervenor was not properly in the case; that such action on his part amounted to a recognition of the right of Dooly to intervene, and that Dooly thus became a party to the cause, upon whom a notice of appeal must be served in order to give this court jurisdiction to hear and determine this appeal; citing, *Gray's Harbor Commercial Co. v. Wotton,* 14 Wash. 87 (43 Pac. 1095); and *Old National Bank v. O. K. Gold Mining Co.,* 19 Wash. 194 (52 Pac. 1065).

In the case of *Gray's Harbor Commercial Co. v. Wotton,* there was a direct recognition of the intervenor as a party to the cause by the trial court, as well as by the plaintiff and defendant, and the complaint in intervention was filed with the clerk of the court. The only defect appearing in the record being the absence of a formal order allowing an intervention.   In the case of *Old National Bank v. O. K. Gold Mining Co.,* the point determined was, that a withdrawal by the intervenors from the cause, after notice of appeal was served, did not cure the failure to serve them with notice while they were parties to the cause.   These cases are not in point in the present action.   The record here not only fails to show any leave of court to intervene, but affirmatively shows that the complaint in intervention was not filed until after the cause had been finally adjudicated between the plaintiff and defendants.   The right of the parties to intervene in an action in this state is statutory, and the statute must be

substantially pursued in order to perfect the right. The statute provides (§ 4846, Bal. Code):

" An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, and is made by a complaint setting forth the grounds upon which the intervention rests, filed by leave of the court or judge on the *ex parte* motion of the party desiring to intervene."

In order to make an intervention effectual, under this provision of the statute, it is necessary not only that leave to intervene be had, but also that the complaint in intervention be filed in the cause while the action is pending between the original parties. A bare service of the complaint upon the opposing parties is not a compliance with the statute, and we are compelled to hold that in this case the filing came too late. And this would be so even had leave to intervene been obtained while the action was pending. The motion to dismiss is denied.

The amended complaint shows that the land described therein, and which is the subject of the present controversy, originally formed a part of the grant made to the Northern Pacific Railroad Company by the act of congress of July 2, 1864, and was forfeited to the United States by the act of congress of September 29, 1890. It is further shown that the appellant, on the 18th day of May, 1891, made application and was allowed to make a homestead entry upon the land before the local land officers at Walla Walla; that he paid the entrance fee required by law and attempted to take possession of the land; that the respondent Eastman, claiming a preference right to purchase the land under the terms of § 3 of the forfeiture act, instituted a contest against the appellant to

cancel his entry; that the appellant had due notice of the contest and an opportunity to defend; that he did defend; and that the contest ran its course in the prescribed way through the land department, being finally decided by the Secretary of the Interior in favor of Eastman. By this action the appellant seeks to set aside and annul the conclusion and judgment of the land department, and have the court find that the lands which were awarded to Eastman should have been awarded to him, and decree a conveyance from the present holders of the legal title to himself.

The appellant separated his complaint into two causes of action, in the first of which he attacks the judgment of the land department for fraud, imposition and false testimony, which he alleges was practiced upon the land officers by the successful party, by reason of which a wrong conclusion of fact was reached; and in the second, for mistake of law made by the Secretary of the Interior, by reason of which the lands were patented to Eastman, when, he contends, if the Secretary had correctly construed the law applicable to the case, the lands would have been patented to himself.

The extent of the authority of the courts to review the decisions of the land department, and for what causes patents to land will be set aside, or a trust declared, by the courts, has frequently been a subject for judicial determination. While it is settled that the power exists, the courts have always been slow to exercise it. Indeed, our attention has been called to no case where a patent has been set aside, or a trust declared, where the charge was fraud, imposition, or false testimony practiced upon the land department. On the other hand, where the charge was mistake or misconstruction of law, the courts have exercised more liberality, though even here it is held the mistake or misconstruction must be clearly manifest, and not

founded upon a possible finding of the facts different from that put upon them by the land department. The doctrines governing this branch of the law can be no better stated than by citations from the authoritative cases. In *Quinby v. Conlan,* 104 U. S. 420, Mr. Justice FIELD, speaking for the court, said:

" It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the land department, on mere questions of fact presented for their determination. It is only when those officers have misconstrued the law applicable to the case, as established before the department, and thus have denied to parties rights which, upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practiced, necessarily affecting their judgment, that the courts can, in a proper proceeding, interfere and refuse to give effect to their action. On this subject we have repeatedly and with emphasis expressed our opinion, and the matter should be deemed settled. *Johnson v. Towsley,* 13 Wall. 72; *Shepley v. Cowan,* 91 U. S., 330-340; *Moore v. Robbins,* 96 U. S. 530. And we may also add, in this connection, that the misconstruction of the law by the officers of the department, which will authorize the interference of the court, must be clearly manifest, and not alleged upon a possible finding of the facts from the evidence different from that reached by them. And, where fraud and misrepresentations are relied upon as ground of interference by the court, they should be stated with such fullness and particularity as to show that they must necessarily have affected the action of the officers of the department. Mere general allegations of fraud and misrepresentations will not suffice."

In *Vance v. Burbank,* 101 U. S. 514, the court said:

" It has also been settled that the fraud in respect to which relief will be granted in this class of cases must be such as has been practiced on the unsuccessful party, and prevented him from exhibiting his case fully to the department, so that it may properly be said there has never been

a decision in a real contest about the subject-matter of inquiry. False testimony or forged documents even are not enough, if the disputed matter has actually been presented to or considered by the appropriate tribunal. *United States v. Throckmorton,* 98 U. S. 61;*Marquez v. Frisbie, supra.* The decision of the proper officers of the department is in the nature of a judicial determination of the matter in dispute."

In the same case it is held, that the appropriate officers of the land department have been constituted a special tribunal to decide questions of this character, and that their decisions are final to the same extent that those of other judicial or *quasi* judicial tribunals are final. In *United States v. Throckmorton,* 98 U. S. 61, it is held that the acts for which a court of equity will, on account of fraud, set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered. And,

" That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases."

The same court, in *United States v. Des Moines Nav. & Ry. Co.,* 142 U. S. 510 (12 Sup. Ct. 308), said:

" It is urged that there is an express averment that the navigation company and its grantees are not and never were *bona fide* purchasers of the lands, or any part thereof. But such a general averment, though repeated once or twice, is to be taken as qualified and limited by the specific facts set forth to show wherein the transaction between the state and the navigation company was fraudulent. Where

a bill sets out a series of facts constituting a transaction between two parties, a demurrer admits the truth of those facts and all reasonable inferences to be drawn therefrom, but not the conclusion which the pleader has seen fit to aver."

In the case of *Durango Land & Coal Co. v. Evans,* 80 Fed. 425, it is said:

" The doctrine is too well settled to admit of any controversy that the decisions of that tribunal [the land department] upon questions properly pending before it can only be annulled when such fraud or imposition is shown to have been practiced as prevented the unsuccessful party in a contest from fully presenting his case, or the officers composing the tribunal from fully considering it, or when such officers have themselves been guilty of fraudulent conduct, or when it is made to appear that, upon the case as established before the land department, the law applicable thereto was misconstrued or misapplied.   If fraud is charged as a ground for annulling a decision of the land department, it is not enough that false testimony or forged documents have been employed; but it must be made to appear that such false testimony has affected the decision, and led to a result which otherwise would not have been reached.   And inasmuch as the findings of the land department on questions of fact are conclusive, when the charge is that the land department has erred in the decision of a mixed question of law and fact, what the facts were, as laid before and found by the department, must be shown, so as to enable the court to see clearly that the law has been misconstrued."

See, also, *Lee v. Johnson,* 116 U. S. 48 (6 Sup. Ct. 249) ; *Marquez v. Frisbie,* 101 U. S. 473; *Moore v. Robbins,* 96 U. S. 530; *Shepley v. Cowan,* 91 U. S. 330; *Johnson v. Towsley,* 13 Wall. 72; *United States v. Atherton,* 102 U. S. 372; *Baldwin v. Stark,* 107 U. S. 463 (2 Sup. Ct. 473) ; *Catholic Bishop of Nesqually v. Gibbon,* 158 U. S. 155 (15 Sup. Ct. 779) ; *Gonzales v. French,* 164 U. S. 338 (17 Sup. Ct. 102).

1.    The particular acts of fraud, imposition, and false testimony relied upon by the appellant, and set forth in the first branch of his complaint, summarized, are that the affidavit of Eastman filed by him in instituting the contest proceedings, and the testimony of the witnesses introduced by him in support thereof, are false and untrue; that Eastman had sold any interest that he may have had in the land in dispute to Patrick Russell and Mary A. Russell several years prior to the making of his affidavit of contest; that he did not apply to purchase the land in good faith, but in the interests of the Russells; that Eastman was not in the actual possession of the said land at the time he instituted the contest but had parted with the possession of the land, together with his right thereto, at least seven years prior to the making of the affidavit, and said Russells had during all of that time possessed, cultivated, and openly and notoriously claimed said land as their own; that prior to instituting the contest Eastman entered into an agreement with the Russells, by the terms of which he agreed to "apply to and purchase said land as the pretended assignee of said Russells, acquire the title to said land in his own name, and afterwards convey it to said Russells for said Russells' sole use and benefit"; that, after procuring the patent he did convey the land to Mary A. Russell in trust for her children; and that by reason of the rules of the land department compulsory process could not be had to force the attendance of unwilling witnesses, and because of this fact he was denied the testimony of at least five witnesses, who would have testified to the falsity of Eastman's contentions.

Laying aside, for the present, the complaint made against the rules governing the land department with reference to witnesses, and the allegation that a deed was executed subsequent to the issuance of the patent to Mary A. Russell in trust for her children, we discover in all this

no question that the land department did not pass upon and decide. There is no allegation that the alleged frauds were unknown to the appellant at the time the contest case was on trial, nor that he was prevented from showing the falsity of the testimony of the contestant, or the truth of the matter, by reason of any act of Eastman or of his co-respondents. On the contrary, it is made to appear affirmatively that the appellant raised, and offered evidence upon, all of these very questions while the cause was on trial before the land department. Having done so, under the authorities cited, he is concluded by its judgment. Were the rule otherwise, no decision of the land department would have any weight or afford any protection to a successful litigant in that department, and it would have been more appropriate had congress directed that contests over a preference right to enter the public lands should be tried in the courts in the first instance. And it would seem, too, that by this judgment the appellant is concluded, not only upon every matter therein litigated, but also upon every matter that might have been therein litigated. *Vance v. Burbank; supra; State v. Bachelder,* 5 Minn. 223 (80 Am. Dec. 410); *Sayward v. Thayer,* 9 Wash. 22 (36 Pac. 966).

Neither can the appellant complain because the rules of the land department do not provide for the compulsory attendance of witnesses in contest cases. The constitution of the United States declares (art. 4, § 3) that "The congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States." By virtue of this provision of the constitution, the power of congress over the public lands of the United States is plenary, and subject to no limitations. Under it "congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to

designate the persons to whom the transfer shall be made."
*Gibson v. Chouteau,* 13 Wall. 92; *Van Brocklin v. State
of Tennessee,* 117 U. S. 151 (6 Sup. Ct. 670).    Having
this absolute power, congress can prescribe before what
tribunal conflicting rights to the public lands shall be tried
and determined; and, having organized the land depart-
ment for that purpose without giving it power to compel
the attendance of witnesses, it must be presumed that con-
gress concluded that this power was unnecessary to secure
a correct determination of such contests.    The other view
mistakes the power of the courts, and the purposes of the
review.    The jurisdiction of the courts does not go to the
extent of reviewing the decisions of the land department
for the purpose of doing abstract justice between litigants,
but only to the extent of ascertaining whether or not a liti-
gant has had a trial according to the rules of law governing
the procedure applicable to that department.

Further, it is shown by the complaint that the testimony
of the witnesses whose attendance could not be procured
would have been but cumulative of that already introduced
in the case on the part of the appellant.    It is alleged that
the facts to which these witnesses would have testified were
actually testified to by the appellant himself and by two
witnesses who are named in the complaint, and also that
"other witnesses testified that Eastman disclaimed any in-
terest in said land, and that Russell had always claimed
the land, and had told them that he had bought it of East-
man."    What the appellant asks in this case is in the
nature of a new trial, and it is a settled rule that a new
trial will rarely be granted on the ground of newly dis-
covered evidence, when the new evidence relied upon is
merely cumulative of that introduced at the former trial.
16 Am. & Eng. Enc. Law, pp. 577-579.

So far as the complaint discloses, the charge of the appel-
lant that the land was deeded by Eastman to Mary A.

Russell in trust for her children, pursuant to an agreement entered into prior to the institution of the contest, seems to be built upon the naked facts that such a deed was made, and that Patrick Russell had, at some time, claimed the land, and was farming it. It is not charged that there was no consideration for the transfer, nor that it was made for anything less than a full and ample consideration. And the excerpt from appellant's own testimony, set out in the complaint, shows that Patrick Russell, when informed by appellant that Eastman had applied to purchase the land, condemned the act in language too forcible to repeat here, and in a manner that would preclude any idea of a conspiracy between them. While the appellant has characterized this part of the transaction as fraudulent, in the language of Mr. Justice MILLER, in *Marquez v. Frisbie, supra:*

" It is too obvious for comment that in all this the only use of the words 'fraud' and 'fraudulent' is to stigmatize acts which are adverse to the plaintiff's view of his own rights. But there is not a syllable which defines an act fraudulent in nature, or done or performed under the influence of corrupt motives, or by corrupt means, by the defendant or by any of the land officers who have had to deal with his claim. . . . It is idle at this day to suppose that the expensive machinery of a court of equity is to be put in operation for the purpose of reviewing and reversing the judgment of the tribunals to whom that question is by law entrusted, on such loose, untraversable allegations of fraud in general."

2. In the second branch of his complaint the appellant complains of errors of law committed by the Secretary of the Interior. The first of these is that the department erred in admitting in evidence a postal card and a circular letter purporting to come from the Northern Pacific Railroad Company; the reasons assigned being that the same "were wholly *ex parte* and unproven, and were not certi-

fied to by any one; that there was a total absence of any proof that said card and circular were ever issued or known to exist by any official of the said railroad company." It is shown by the complaint that these documents were attached to the original affidavit filed by Eastman on instituting the contest against appellant's homestead entry, as evidence of his license from the Northern Pacific Railroad Company to take and hold possession of the disputed land. In that affidavit it is alleged, and of course sworn to, that both the postal card and circular letter were issued by the Northern Pacific Railroad Company. They are also referred to in the testimony introduced on the trial as having been issued by that company, and their genuineness does not seem to have been disputed—the objection to them being made on purely technical grounds. It would seem, in the absence of a contrary showing, that this would be sufficient to authorize their consideration as evidence by the land department. But, however this may be,

" The courts cannot review the decisions of the land department on the ground that the evidence was insufficient, or that only incompetent evidence was before it. The power to try questions of fact necessarily embraces the power to pass upon the weight and competency of evidence." *Parsons v. Venzke,* 4 N. D. 452 (61 N. W. 1036, 50 Am. St. Rep. 669).

It is next objected that the Secretary of the Interior erred in holding that Eastman had possession of the land in dispute by virtue of a license from the Northern Pacific Railroad Company, within the meaning of the third section of the act of September 29, 1890. This presents a mixed question of law and fact, and it may be doubted whether the appellant has set out in his complaint enough of the record to warrant us in examining the matter (the findings of fact by the Secretary not being set out), but,

waiving this, we think there was evidence which, if the Secretary found to be true,—and for the purposes of this case we must believe he so found,—warranted the conclusion at which he arrived.

It is shown that Patrick Russell took possession of, and made application to purchase, this land from the Northern Pacific Railroad Company in 1878; that he received from the company in reply to his application a postal card acknowledging its receipt, and stating that his application had been placed on file, and briefly describing character of settlement or improvement necessary to be made in order to obtain a preference right of purchase from the company. In the same year he sold such improvements as he had put upon the land to Eastman, and delivered to him possession of the land and the postal card. Within the two years following, Eastman caused the land to be fenced and plowed, and it appears that he cropped it personally up to 1884; that he owned certain deeded land adjoining this tract, which he sold to Russell in that year; and that Russell from that time down to the time of the date of the contest had possession of the disputed land as the tenant of Eastman; that Eastman had never parted with his right of possession of, or claim to, the land; and that he expected to purchase it from the Northern Pacific Railroad Company when that company should earn it by compliance with the terms of the original grant. As further evidence of his license, and to show the policy of the railroad company with reference to these lands, and the persons whom that company would recognize as having a preference right of purchase had the lands been earned by it, Eastman introduced in evidence the circular letter above referred to. This bore date of March 16, 1891, and was addressed "To Whom it may Concern," and contained, among others, the following recitals:

" This certifies that on the twelfth day of October, 1871,

the Board of Directors of the Northern Pacific Railroad Company passed a resolution inviting settlement and improvement of the agricultural lands of said company, prior to their being offered for sale, with the assurance that such settlers or improvers, as soon as the land should be appraised and ready for sale, would have the first privilege of purchasing them upon the regular terms of sale and at the regular prices of such lands in such localities, which prices will be fixed without reference to the improvement:

" Provided, such person shall file in the land office of said company in the district where said lands lie, written notice of such settlement, and shall accept the privilege upon the condition that when the prices of the lands are fixed, and notice thereof is sent to his residence or post-office address by the company's land agent through the post-office or otherwise, the said person will, within ninety days from the date of such notice, enter into a regular contract with the company for the purchase of the lands, and if he fails to do so, the company may sell the lands to any other person.    .    .    .    .    .    .    .    .    .

" That substantially, to wit: on the fourth day of January, 1873, another resolution to the same effect was passed by the said board of directors;

" That wide publicity was given to said resolutions with the object of attracting immigration and securing the improvement and cultivation of the agricultural lands of the company, thereby creating traffic for the road in advance of its construction;

" That actual settlement on the land was not an essential requirement, but *bona fide* improvement was a prerequisite to securing any rights thereunder;

" That in accordance with the terms of said resolution a large number of applications were filed in this office by settlers and others desiring to improve the lands of the company not in market; that in June, 1882, the policy of grading the lands of the company prior to offering the same for sale was adopted, and the practice of receiving and noting such applications were thereupon discontinued;

" That thereafter the records and files of former applications received less attention and in the course of time and owing to the several removals of the office, became to some

extent mutilated, destroyed, misplaced, confused and un-reliable, as the examiner's notes would thereafter be relied upon principally for information as to the parties in possession, nature of improvements, etc., when the lands should be offered for sale;

" That the policy of allowing persons to go on and im-prove such lands was nevertheless continued, and they were encouraged in so doing;

" That were the lands embraced in the forfeiture pro-vision of the act of September 29, 1890, to be offered for sale by the company, persons now in possession or owning valuable improvements thereon, would be, under our exist-ing policy and practice, accorded a preference right of purchase, and would be notified and allowed ninety days to enter into contract for the purchase of the same, in accordance with the terms of said resolution;  .  .  .

" That this certificate is given  .  .  .  as indicating the policy and practice of the company as regards these lands and the nature of the license under which many have gone upon and improved lands to which they are now seeking to acquire title under the provisions of said act of September 29, 1890.  .  .  ."

The third section of the act of September 29, 1890 (26 U. S. St. at Large, 496), is, in part, as follows:

" That in all cases where persons being citizens of the United States, or who have declared their intentions to become such, in accordance with the naturalization laws of the United States, are in possession of any of the lands affected by any such grant, and hereby resumed by and restored to the United States, under deed, written contract with, or license from the State or corporation to which such grant was made, or its assignees, executed prior to Janu-ary 1, 1888, or where persons may have settled said lands with *bona fide* intent to secure title thereto by purchase from the State or corporation, when earned by compliance with the conditions or requirements of the granting acts of Congress, they shall be entitled to purchase the same from the United States, in quantities not exceeding three hun-dred and twenty acres to any one such person, at the rate of one dollar and twenty-five cents per acre, at any time

within two years from the passage of this act, and on making said payments, to receive patents therefor, and where any such person in actual possession of any such lands, and having improved the same prior to the first day of January, 1890, under deed, written contract, or license as aforesaid, or his assignor, has made partial or full payments to said railroad company prior to said date, on account of the purchase price of said lands from it, on proof of the amount of such payments, he shall be entitled to have the same, to the extent and the amount of one dollar and twenty-five cents per acre, if so much has been paid, and not more, credited to him on account of, and as part of the purchase price herein provided to be paid the United States for said lands, or such persons may elect to abandon their purchases, and make claim on said lands under the homestead law, and as provided in the preceding section of this act;  .  ..  ."

· At the time of the passage of this act, it was a matter of common knowledge that practically all of the agricultural lands affected by it had, with the permission of the original grantees, been taken possession of, in part by persons who had made valuable improvements thereon, and in part by others who had actually settled and made homes thereon, relying upon the promise of such grantees that they should have a preference right of purchase when the land should be earned by a compliance with the granting acts of congress, and become subject to sale by such grantees.   It was known, also, that many of such persons had exercised their rights to acquire public lands from the United States under the then existing land laws, and that, did congress pass a direct forfeiture act, without providing for their protection, they would be compelled to abandon their possessions and homes and forfeit valuable property they had been years in acquiring.   It is impossible to read the provisions of the act without reaching the conclusion that congress had in mind these conditions when it passed it, and knowledge of the manifest injustice that would be

done these people, unless it afforded them some right to acquire title, other than what they would have under the existing land laws; and it is fair to conclude that the statute was intended to meet these conditions, and protect these people in their possessions, and afford them a means of acquiring the ultimate title to a limited quantity of such of the land as they might have possession of, or have settled upon. The statute was thus remedial, and, being such, should be liberally construed.

Turning to the section of the act above quoted, it will be noticed that there are two classes of persons designated who have a preference right of purchase. The first are persons in possession "under deed, written contract with, or license from" the original grantee, "executed prior to January 1, 1888." And the second are, persons who "may have settled said lands with *bona fide* intent to secure title thereto by purchase" from the original grantee. Eastman, as shown by the evidence, was not a settler on the land, but acquired his right, if any, by reason of belonging to the class of persons included within the first designation. It is shown that he had possession of the land prior to January 1, 1888, and at the time of the passage of the forfeiture act; that he had made valuable improvements on the land; and that he intended and expected to purchase it from the Northern Pacific Railroad Company when that company should acquire title by a compliance with the granting acts of congress. Was he in possession under license from that company? It seems to us there can be no question but that he was. It is true the original resolutions inviting settlement on these lands, passed by the board of directors of the railroad company, required that the settler should file in the land office of the company, in the district where the lands lie, written notice of such settlement, and that Eastman did not do this. But it appears that in practice it was found impracticable to keep

a record of these notices, and the policy of requiring it had been discontinued by the company's agents, who had charge of its land department, long prior to January 1, 1888, and that a new method had been adopted for determining who had a preference right of purchase, viz., an inspection by a special examiner when the lands were offered for sale. This requirement was one that the company could waive, and its waiver by the persons who had in charge its execution was as effectual as it would have been had it been done by the board of directors themselves.    Added to this, we have the statement of the circular letter:  "That were the lands embraced within the forfeiture provisions of the act of September 29, 1890, to be offered for sale by the company, persons now in possession, or owning valuable improvements thereon, would be, under our existing policy and practice, accorded a preference right of purchase." "A license," as defined by Chancellor Kent (3 Kent, Comm. 452), "is an authority to do a particular act, or series of acts, upon another's land, without possessing any estate therein."    It may be granted by parol, and needs no consideration to support it.  "An executed license exists when the licensed act has been done."    Bouvier, Law Dictionary, title, License.    Viewed in this light, it is apparent that the resolutions of the railroad company granted a general license to any person who might choose to accept it, to take possession of, or settle upon, any of the agricultural lands included within the grant to that company, and that such license became executed when possession was taken, or settlement made.

Having possession under a license from the Northern Pacific Railroad Company, Eastman had a preference right of purchase from the United States, and the Secretary of the Interior correctly so decided.

But the appellant states in his complaint that the Secretary held that the license from the railroad company was

granted to Russell, and that Eastman's rights depend upon an assignment of such license.    And he argues that a license, being but a mere personal right and founded in personal confidence, is not assignable; and hence Eastman could not have acquired a preference right of purchase by reason of the assignment to him by Russell.    As we have before indicated, inasmuch as the appellant has not set out the findings of fact of the Secretary, but has chosen to outline the evidence upon which the judgment was based, we are bound to assume that the Secretary found as true that evidence which supports his judgment; and, in so doing, we have found that the evidence supports the conclusion that Eastman himself had a license to take possession granted him by the Northern Pacific Railroad Company.    This renders it unnecessary to consider the question here argued.    If it were necessary, however, to so decide, we think a license of this character is assignable.    Russell having taken possession under a promise of a preference right of purchase, and having improved the land on the faith of that promise, his became a right coupled with an interest which equity would not allow the licensee to revoke, and, as such, it is assignable.    Note to *Ricker v. Kelly,* 10 Am. Dec. 38, 41; *Baldwin v. Taylor,* 166 Pa. St. 507 (31 Atl. 250).

The appellant next objects that the Secretary of the Interior "erred in holding that actual possession and actual settlement were not essential prerequisites to a preference right" of purchase.    An examination of the opinion of the Secretary (18 Land Dec. 337) will show that his ruling was not so broad as the objection indicates, nor was it necessary for it to be so, in order to find in favor of Eastman.    As we have said, there are two distinct classes of persons referred to in the descriptive portions of the section of the act quoted, viz., persons who "are in possession" of such lands "under deed, written contract with, or

license from, the state or corporation to which such grant was made, or its assignees," and persons who "may have settled said lands with *bona fide* intent to secure title thereto by purchase." It is clear from this that congress did not mean by the phrase "are in possession" that an actual settlement on the land was necessary, for it provided specially for the class of claimants who had thus actually settled. If it be contended that "possession" means actual possession, the result would not be different. "By actual possession," says Chief Justice FIELD, in *Coryell v. Cain,* 16 Cal. 567, "is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation, by a substantial enclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property." See, also, *Staininger v. Andrews,* 4 Nev. 59.

Lastly, it is argued that no contest could be legally instituted against the appellant for any other causes than those prescribed by the Revised Statutes (§ 2297), which does not include the cause mentioned in Eastman's affidavit of contest; and, consequently, the land department had no jurisdiction to hear and determine the question decided by it in this instance. To this objection it is a sufficient answer to say that the power to determine all contests arising under the statutes granting rights to acquire title to the public lands of the United States is vested by the acts of congress in the land department; and, while congress may not have said in the particular act in question that contests arising under it should be tried by that tribunal, the land department has jurisdiction by virtue of the general powers conferred upon it. *Knight v. United States Land Association,* 142 U. S. 161 (12 Sup. Ct. 258).

There was no error in the disposition of the case by the court below, and its judgment is, therefore, affirmed.

ANDERS, DUNBAR and REAVIS, JJ., concur.

GORDON, C. J.—Expressing no opinion on the motion to dismiss the appeal, I concur in what is said upon the merits.