[Nos. 12730, 12732, 12737.  *En Banc.*  April 22, 1915.]

THE STATE OF WASHINGTON, *on the Relation of F. G. Blakeslee, Plaintiff*, v. C. W. CLAUSEN, *State Auditor, Respondent.*

THE STATE OF WASHINGTON, *on the Relation of Schwabacher Brothers & Company, Incorporated, Plaintiff*, v. C. W. CLAUSEN, *State Auditor, Respondent.*

THE STATE OF WASHINGTON, *on the Relation of James Martin, Plaintiff*, v. C. W. CLAUSEN, *State Auditor, Respondent.*[1]

CONSTITUTIONAL LAW — CONSTRUCTION OF CONSTITUTIONAL PROVISIONS.  In ascertaining the intent in adopting an amendment to the constitution providing for the referendum on new laws, courts may resort to the history of such legislation, the contemporaneous construction, the changes made, the context and subject-matter, and the purpose and spirit of the act and the form in which the idea has been fashioned in other states.

STATUTES—ENACTMENT—REFERENDUM — "SUPPORT."  The seventh amendment of the state constitution (Const., art. 2, § 1, subd. b) giving the right of referendum upon all laws except such as may be necessary for the "immediate preservation of the public peace, health and safety, [and the] support of the state government and its existing public institutions," contemplates "support" as including appropriations for current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for such new buildings and conveniences as may be necessary to meet the needs and requirements of the state in relation to its existing institutions.

SAME — REFERENDUM — APPROPRIATIONS.  Under such referendum clause of the constitution, a law providing for a state institution and carrying an appropriation is subject to referendum, where it brings the state into a new activity or provides for a new function, so that it might be fairly said that it did not pertain to the support of the government as then organized, or to any existing institution.

SAME—REFERENCE OF PART OF ACT—EFFECT ON "SUPPORT" PROVISIONS.  All ordinary appropriation bills are excepted from the operation of such referendum clause of the constitution; but the pres-

[1]Reported in 148 Pac. 28.

ence of an appropriation measure as part of a bill would not necessarily deprive the people of the right to pass upon other portions of the bill; nor would an appropriation for the support of an existing institution fail while some particular item in a general law of which it is a part is subject to referendum.

SAME—"PUBLIC INSTITUTIONS." The highway department, the fisheries department, and the state fair are "public institutions" of the state, within the meaning of the referendum amendment to the constitution excepting laws for their support from the operation of the amendment; since "public institutions" includes all departments exercising any state activity or function.

STATUTES — ENACTMENT — REFERENDUM — "IMMEDIATE." In the clause of the referendum section of the constitution excepting from its operation laws for "the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions," the qualifying adjective "immediate" refers solely to the subsequents of the series, and not to the term "support"; hence appropriation measures for the support of state government and institutions are reserved from referendum, although not of an emergent character.

STATUTES—ENACTMENT—TIME OF TAKING EFFECT. The legislature, in the absence of constitutional restraint, can fix any time in the future as the time when laws shall become effective.

FULLERTON, J., dissents.

Application filed in the supreme court April 1, 1915, for a writ of mandamus to compel the state auditor to issue warrants for material and supplies furnished certain state departments. Granted.

*Troy & Sturdevant*, for relator Blakeslee.

*Kerr & McCord*, for relator Schwabacher Brothers & Co.

*Fletcher & Evans*, for relator Martin.

*The Attorney General*, for respondent.

CHADWICK, J.—These cases depend upon the answer to the question whether items in appropriation bills, in so far as they affect the claims of the relators, are subject to the referendum under the seventh amendment to the constitution of this state.

The claim of the relator Blakeslee is for materials furnished to the highway department of the state of Washington. The claim of the relator Schwabacher Brothers & Company is for food for young salmon hatched at the state fish hatcheries and bought by the fisheries department of the state of Washington. The claim of the relator Martin is for supplies furnished to the agricultural department of the state of Washington. Inasmuch as all of these cases rest upon, and must be determined by reference to, the same principle, we will accept, as the subject of our discussion, the claim of relator Blakeslee.

At the 1913 session of the legislature, a general scheme of highway development was adopted. Laws 1913, p. 221 (3 Rem. & Bal. Code, § 5878-1). Appropriations were made and much work done under the supervision of the highway department of the state. Appropriations were made by the legislature just adjourned to continue the general scheme, to maintain existing highways, to finish those under construction, and to survey and construct new highways. Those sections of the appropriation bill which are pertinent to our present discussion are as follows:

"Section 1. For the survey, construction and maintenance of primary and secondary highways of the state, there is hereby appropriated out of the public highway fund the sum of one million nine hundred thirty-seven thousand, nine hundred eighty-five dollars ($1,937,985.00) apportioned in the manner hereinafter provided: . . .

"The Olympic Highway, for survey and construction, between Shelton and Quilcene................$96,250.00."
Laws 1915, p. 182.

The relator sold certain supplies and materials to the highway department to be used in the survey and construction of that part of the Olympic highway between Shelton and Quilcene. The state auditor refused to audit his bill and draw a warrant, upon the ground that the emergency clause attached to the bill is not operative to carry the appropria-

tion over the right of referendum reserved by the people in the seventh amendment to the constitution of the state. Const., art. 2, § 1, subd. b.

The emergency clause, with the exception of two words which in no way affect its sense, is in the language of the constitution, § 2.

"Sec. 2. This act is necessary for the immediate preservation of the public peace, health and safety, [and the] support of the state government, and its existing public institutions, and shall take effect April 1, 1915." Laws 1915, p. 185.

· Thereupon relator brought this proceeding in mandamus to compel the issuance of a warrant in payment of his bill, insisting that the appropriation is presently available. While an argument is made upon the theory that the appropriation is necessary for the immediate preservation of the peace, health and safety, we are not disposed to follow it. Our judgment may be put upon surer ground. The real controversy revolves around the words "support" and "public institutions."

The relator contends that "support" means any appropriation designed to promote or effectuate any of the admitted functions of the state, and that a "public institution" is any branch or department of the state government to which any of its functions may have been delegated by the legislature; that the highway department and an established road are at once existing institutions within the meaning of the constitution.

*The Attorney General* contends that the word "support" must be taken in a literal and restricted sense, and means "the continuing regular expenditures of the various state offices and departments for the maintenance of such offices and departments. Under this interpretation, the term would include salaries, fuel, current repairs, supplies, printing and other current expenses of like character." In other words, he contends that the words "support of the state government

and its existing institutions" means no more than "current expenses." To sustain this construction, he relies mainly upon the case of *McClure v. Nye*, 22 Cal. App. 248, 133 Pac. 1145. It may be said if the *McClure* case is not an apt authority there is no authority to sustain the attitude of the respondent. It would probably be enough to say that the exception reserved by the people of the state of California is enough to distinguish that case; the exception being appropriations for "current expenses," whereas we have no such limitation. However, inasmuch as counsel for the respondent is apparently serious in his contentions, we shall endeavor to show wherein the *McClure* case has no bearing on the cases at bar.

The word "support" may have either meaning. Our duty is to find the legislative intent in passing the amendment, and the like intent of the people in adopting it. While we think the language of the constitution is plain and unambiguous and calls for no construction, if there be any doubt, there is no better rule—indeed there is no other rule to which we can refer—than the purpose of the amendment as it may be gathered from the history of such legislation, with its contemporaneous construction and discussion.

In all matters involving an inquiry into political questions, especially so where they relate to a change in accepted forms and fundamental theories, courts must take notice of such changes, the sentiments which sustain them, the reasons urged for or against them, the old condition and the purpose of the change. If it were not so, there could be no rule of construction. There can be no resort to precedent, except in the way of analogy; for the question is one of first inquiry, and precedent is no more than a former decision or accepted practice applying a settled principle to a new or existing condition.

Let us then briefly consider the new order popularly known as direct legislation. The idea did not come from South Dakota or Oregon. It is as old as government. It

was considered by the framers of the Federal constitution. They found that the right of the people to compel responsive legislation would be sufficiently secured by frequent elections. In later years, the idea was revived. Following an agitation sustained by a persistent propaganda, the plan was framed in words and adopted as a part of the fundamental law in several states of the Union.

The state of Washington, though not the first to adopt an amendment to its constitution, did not borrow the idea from any of the states which had adopted it. The agitation in its favor did not ripen quite so soon in this state; but, at the time other states adopted it, the idea of direct legislation was a live question, which, like most questions of great public interest, became so persistent that it could be settled only by adoption or rejection.

It must be kept in mind that the theory of direct legislation and the referendum is a thing neither new nor original. On the other hand, the purpose, the limitations on the legislature and reservations of the people attending its exercise, are to be gathered from the words, context, subject-matter, reason and spirit of the enactment, just as any other law or declaration of fundamental right is to be ascertained. In ascertaining the purpose and its limitations and reservations, we may well look to the form in which the idea has been fashioned in other states, and their experiences, assuming that the legislature and the people had these in mind and, if evil, that they intended to avoid them; if good, that they intended to adopt them.

"Moreover, it must not be overlooked that this legislation is experimental. Even in construing the terms of a statute, courts must take notice of the history of legislation, and, out of different possible constructions, select and apply the one that best comports with the genius of our institutions and, therefore, most likely to have been the construction intended by the law-making power." *Texas & Pac. R. Co. v. Interstate Commerce Commission*, 162 U. S. 197.

"Courts in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary in order to ascertain the reason as well as the meaning of particular provisions in it. *Aldridge v. Williams*, 3 How. 24; *Preston v. Browder*, 1 Wheat. 120." *United States v. Union Pac. R. Co.*, 91 U. S. 72.

"And it may recur to the general state of opinion—public, judicial, and legislative—at the time of the enactment. End. Interp. St. § 29." *United States v. Oregon & C. R. Co.*, 57 Fed. 426.

"If the words of the law seem to be of doubtful import, it may then perhaps become necessary to look beyond them in order to ascertain what was the legislative mind at the time the law was enacted; what the circumstances were under which the action was taken; what evil, if any, was meant to be redressed; what was the leading object of the law, and what the subordinate and relatively unimportant objects." *Maryland Agricultural College v. Atkinson*, 102 Md. 557, 62 Atl. 1035.

"Statutes are but public sentiments enacted into laws, and frequently the policy of such legislation is the subject of much public discussion, both before and at the time of its enactment. In construing it courts may not shut their eyes to these public discussions. They are proper matters of consideration in determining the legislative intent, and should be considered for that purpose in the construction of an act growing out of such discussion." *State ex rel. Coleman v. Kelly*, 71 Kan. 811, 81 Pac. 450, 70 L. R. A. (N. S.) 450.

"Constitutions are to be construed as the people construed them in their adoption, if possible; and the public history of the times should be consulted, and should have weight in arriving at that construction." *Bay City v. State Treasurer*, 23 Mich. 499.

"To ascertain the intention of a statute, it should be read in view of all the surrounding facts and circumstances under which it was enacted and, it may be added, 'common sense and good faith are the leading and principal characteristics of all interpretation.' (*Bank v. Haywood*, 62 Mo. App. 550; Potter's Dwarris on Statutes and Constitutions, p. 48, *Sedalia v. Smith*, 104 S. W. 21, 206 Mo. 346)." *Lexington*

*ex rel. Menefee v. Commercial Bank*, 130 Mo. App. 687, 108 S. W. 1095.

Several years before the legislature submitted the amendment to our constitution, the people of Oregon had adopted the initiative and referendum with practically· no limitations. Their constitution reads, "except as to laws necessary for the immediate preservation of the public peace, health, or safety."

It was a matter of common knowledge that, under this unbridled license to refer legislation, the state university had been denied the benefit of an appropriation for its support and maintenance; that one of the state institutions exercising an essential function of the state had been crippled and embarrassed and but for the pledge of private credit would have been destroyed, for a time, at least. This and like facts were urged by those opposed to the initiative and referendum.

Our state schools, from the primary grades of the public school to the highest degrees bestowed by our colleges, are the brightest jewel in the crown of American accomplishment. In no state has there been a greater loyalty to the idea that an educated citizen is a safe citizen than in the state of Washington. Our common school system is rated first in general efficiency of all the states in the Union by the Russell Sage Foundation. We may well assume that the people of this state had no intention of falling into the error that Oregon had made, and so framed their constitution that our government and its institutions should not be put to the embarrassments that might follow an agitation which could be supported and a vote compelled by a number of the electors so small that it may be said to be merely nominal—six per cent of the vote cast at a previous election. It would seem that they could not have adopted plainer or simpler language than they did: "support of the state government and its existing institutions."

A year before the people of this state acted, the people of California had adopted a constitution in which they had reserved the right to act upon all appropriations except those passed for the "current expenses of the state."

It must have been manifest, if this reservation were adopted, that the growth and development of our state institutions, as well as the support of the government, might be seriously impaired by reckless and irresponsible agitation sustained by a number so few that it could not, by any generosity of opinion, be said to represent general sentiment or public opinion and that our people purposely avoided the probability of such evil consequences.

The fault of the *Attorney General's* argument lies in this: He assumes a condition that cannot exist if we give the words of our constitution their ordinary meaning, and rests his argument upon authorities construing forms and phrases which the people of this state not only had no intention of adopting but purposely rejected. The cases from other states are, therefore, valueless either as precedent or authority. They are right when applied to their own constitutions, but none of them assume to discuss the meaning of our own.

As illustrative of the care taken by the people of the several states to express their real intention, we will assume the risk of being indicted for prolixity and copy the exceptions found in several of the later constitutions and amendments.

The exception in the Oregon and Arkansas constitutions is, "except as to laws necessary for the immediate preservation of the public peace, health, or safety." Const. Ore., art. 4, § 1; Const. Ark., amend. 10, § 1.

Oklahoma excepts enactments for carrying into effect provisions relating to the initiative and referendum or a general appropriation bill:

"An emergency measure shall include only such measures as are immediately necessary for the preservation of the public peace, health, or safety, and shall not include the granting of franchises or licenses to a corporation or individual, to

extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or encumbrance of real property for a longer term than one year." Const., art. 5, § 58.

California excepts, "acts calling elections, acts providing for tax levies or appropriations for the usual current expenses of the state and urgency measures necessary for the immediate preservation of the public peace, health or safety, passed by a two-thirds vote of all the members elected to each house. Whenever it is deemed necessary for the immediate preservation of the public peace, health or safety that a law shall go into immediate effect," etc. Const., art. 4, § 1.

Ohio reserves the referendum of, "Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect." Const., amend. art. 2, § 1d.

Colorado excepts laws, "necessary for the immediate preservation of the public peace, health or safety, and appropriations for the support and maintenance of the department of state and state institutions." Const., art. 5, § 1.

Michigan provides: "except that the legislature may give immediate effect to acts making appropriations and acts immediately necessary for the preservation of the public peace, health or safety by a two-thirds vote of the members elected to each house." Const., art. 5, § 21.

South Dakota excepts, "such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions." Const., art. 3, § 1.

Our constitution is, in meaning, the same as the constitution of Michigan, but not quite so specific as is the constitution of Colorado. The question whether appropriation bills or bills for the support of the government and its existing institutions should be subject to the referendum being at

all times a live topic of controversy pending the adoption of
these amendments, we must credit the people with knowing
their own purposes and with knowing how to express them.
If they had intended that general appropriations or appro-
priations other than those for current expenses should be
subject to the referendum, it would seem that they would
have done here as they did in Ohio, reserve the authority to
pass upon any item of an appropriation bill; or as they
did in California, limit the reservation to all appropriations
other than those for current expenses.   Our constitutional
provision means just what we said in the case of *State
ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11:

"The true rule is:   The referendum cannot be withheld
by the legislature in any case except it be where the act
touches the immediate preservation of the public peace,
health, or safety, or the act is for the financial support of
the government and the public institutions of the state, that
is, appropriation bills."

The intent and purpose of the people, as gathered from
the words of the constitution and the circumstances attend-
ing the adoption of the seventh amendment, impels the hold-
ing that the people intended to use the word "support" in
its fullest sense.   When so considered, "support" includes
appropriations for current expenses, maintenance, upkeep,
continuation of existing functions, as well as appropriations
for such new buildings and conveniences as may be necessary
to meet the needs and requirements of the state in relation
to its existing institutions.

In Webster's New International Dictionary, the word "sup-
port" is given the following definitions:   "To furnish with
funds or means for maintenance; to maintain; to provide for.
To enable to continue; to carry on."

In the absence of an express reservation, it would be a
usurpation on the part of any court to say that an appro-
priation directed to the maintenance of the existing activities
of the state is subject to the referendum.   The first right of

government is the right of self-preservation, and to say that the people intended, in the absence of an express reservation, to allow the government or its institutions to be crippled or embarrassed in any way would be to say that the people intended that the government could not sustain itself through the mediumship of the ordinary and recognized methods of legislation.

The case of *Sheldon v. Purdy*, 17 Wash. 135, 49 Pac. 228, is relied on. It has no application to the cases at bar. It was there held, under existing statutes and § 5, art. 7 of the constitution, that, inasmuch as the legislature had provided a certain method for building new buildings in a school district, money raised to carry on and meet the current expenses of the common schools could not be diverted to the building of new buildings. It is true that the court said:

"The terms 'support' and 'current expenses,' when applied to the common schools of this state, mean continuing regular expenditures for the maintenance of the schools."

The court was not dealing with those words in the abstract, but was defining them in the light of existing and controlling statutes and the constitution.

It does not follow that a referendum may not be had of a law, or any part of a law, carrying an appropriation. If a law were passed bringing the state into a new activity, or providing for a new function so that it might be fairly said that it did not pertain to the support of the government as then organized or to any *existing* institution, as for instance, a law like the one creating the industrial insurance commission, the law creating a railroad commission, or a law establishing an entirely new institution, the rejection of the law would cause a lapsation of the appropriation.

The *Attorney General* says:

"The necessities of this case should not be permitted to blind the court to the real question, and that is, have the people the right to refer the fisheries code, or any part thereof? Have the people the right to refer the question of

the character of the appliances for the taking of fish permitted by that law, or have they the right to refer the revenue features of the law? The fact that the revenues are to be paid into a fisheries fund is immaterial. Suppose the legislature had provided for the payment of these revenues into the general fund. In that event, the present case would not be presented. But how would the court answer the question of the right of the people to invoke the referendum on this measure?"

The court is not called upon to answer the question. It is answered in the constitution. If the people desire a referendum upon any part of the bill referred to as the fisheries code, they have reserved that right in subdivision "b" of section 1, article 2, of the amendment. They say that a referendum may be ordered on any act, bill, law, or any part thereof passed by the legislature. If the people desire to pass upon the character of appliances for taking fish or any other feature of the law, they may do so, but it does not follow that an appropriation made by the legislature, either directly or indirectly, for the support of an existing institution must fail while some particular item in a general code is subject to the referendum. "We must not make a scarecrow of the law." The people very wisely forestalled the possibility of the situations suggested by counsel when they reserved the right to refer a part of a bill. Their evident purpose was to prevent the stoppage of the state's established functions pending a vote upon some question of policy.

It was clearly the intention of the people to except all ordinary appropriation bills. An appropriation bill is not a law in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. It is purely *lex scripta*. It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government. Such bills pertain only to the administrative functions of government. In excepting them and measures referable to the police power, it is manifest that the legislature and the people intended to re-

serve to themselves the right to pass upon only such laws as define substantive rights, or which affect public measures and policies. It follows that the highway department, the fisheries department, and the state fair, are "public institutions" of the state.

We understand the *Attorney General's* argument to be that an existing public institution is some activity of the state which has taken form and is lodged in buildings or structures. The words "public institutions" can be given no such restricted meaning. A public institution is any organized activity created or established by law or public authority. Corporations are held to be public or political institutions. *Toledo Bank v. Bond*, 1 Ohio St. 622; *Mannington v. Hocking Valley R. Co.*, 183 Fed. 133.

The word "institution" is defined in Webster's New International Dictionary as "anything forming a characteristic and persistent feature in our national life or habits." "Established or organized society or corporations; an establishment, especially one of public character or one affecting a community."

"That the word 'institution,' both in legal and colloquial use, admits of application to physical things, cannot be questioned. One of its meanings, as defined in Webster's Unabridged Dictionary, is 'an establishment, especially of a public character, affecting a community.' And one of the meanings of 'establishment' as defined by the same authority, is 'the place in which one is permanently fixed for residence or business; residence with grounds, furniture, equipage, etc., with which one is fitted out; also, any office or place of business, with its fixtures.' The term 'institution' is sometimes used as descriptive of an establishment, or place, where the business or operations of a society or association is carried on; at other times it is used to designate the organized body." *Trustees of the Academy of Richmond County v. Bohler*, 80 Ga. 159, 7 S. E. 633.

If our argument be sound, it follows that a public institution of the state, within the meaning of the seventh amendment, is not alone those institutions of a physical character,

but, also, all branches and departments created by law and exercising any activity or function defined by the legislature and existing at the time the amendment was adopted, or which, if newly created by the legislature, have not been rejected by resort to the referendum.

Upon any theory, a public highway is a public institution. A road is not only a physical institution built by the state in the exercise of its sovereign duty to promote the convenience and necessities of the citizen as well as the common welfare, but the department to which the legislature has delegated that function is an institution as much so as is its creator, the legislature.

Some contention has been made that the word "immediate" qualifies the words "support of the state government and its existing institutions." The word immediate qualifies the words "public peace, health or safety" and no more. Where an adjective qualifies a series of words having relation, the one to the other, the last one being preceded by a connective, the qualifying word does not carry beyond the series.

In *State v. Bailey*, 67 Wash. 336, 121 Pac. 821, we had a similar question of construction. There the qualifying words were at the end of the sentence. We referred to the rule, as laid down in 2 Lewis' Sutherland, Statutory Construction (2d ed.), § 420:

"Relative and qualifying words and phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent;"

and held that the words "which produces intoxication" did not qualify any words back of the connective "or." If the rule be good it is likewise the rule that the qualifying adjective "immediate" refers solely to the subsequents in the series.

"Peace, health and safety," are to be construed as coordinate words when determining either a power of government or a reservation of power. They refer to perils which may beset the state or its citizens, whereas the support of the gov-

ernment and its institutions, from the nature of things, im-
plies deliberation and the application of business principles,
which may be as profitably exercised in public affairs as in
matters of private concern.   Moreover, it is a matter of
common knowledge that the fiscal year of the state does not
begin until the legislature adjourns.   If we qualified the word
"support" with the word "immediate," only appropriations
of an extraordinary character would escape the referendum.
As said in the Missouri Appeals case and by Mr. Suther-
land, § 402,· *supra*, common sense is a safe guide in constru-
ing statutes.   If our conclusion be not the proper one, the
constitutional provision would, in the light of its words and
existing conditions, be ridiculous.

In answer to the suggestion that the legislature having
fixed the time when the bill shall go into effect as April 1st
is a circumstance indicating that the bill is not an emergent
measure, it is enough to say that, having held that the bills
here questioned, in so far as appropriation items are con-
cerned, fall within the exception to the seventh amendment,
the question does not occur.   The legislature, in the absence
of constitutional restraint, can fix any time in the future as
the time when laws shall become effective.

No reason that appeals to us has been offered in support
of the position of the respondent, nor does any reason sug-
gest itself to our imagination.

The writ will issue.

PARKER, MAIN, and ELLIS, JJ., concur.

MORRIS, C. J., MOUNT, and CROW, JJ. (concurring)—
We concur in the result for the reason that the question is a
legislative and not a judicial question.

HOLCOMB, J. (concurring)—I concur in the foregoing
opinion and would do so even if I had dissented in the *Bris-
lawn* case.   The decision in that case, until it shall have been
reversed, is the law of this state.   Believing that the parties
interested in this action are entitled to the opinion of each

member of this court upon the question whether the act here involved falls within the exceptions to the reserved power of referendum contained in the seventh amendment to the constitution, with the decision in the *Brislawn* case as a factor, I desire to express my concurrence in this opinion on that as well as other grounds.

FULLERTON, J. (dissenting)—The opinion of the court in this case, and the opinions in the companion cases of *State ex rel. Case v. Howell, post* pp. 281, 294, 147 Pac. 1162, 1159, but emphasize, to my mind, the error into which the court fell in the case of *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 Pac. 11. If any general conclusions or rules may be gathered from these opinions, they are these: (1) The court has power to inquire whether an act declared emergent by the legislature is or is not emergent; (2) that, in making such inquiry, the court will not enter into an examination of extrinsic evidence, but will determine the fact of emergency from the face of the act, tested in the light of those matters of public concern of which it may take judicial knowledge; and (3) that, if it finds, on making such inquiry, that doubt exists as to the fact of emergency, it will uphold the law, otherwise the law will be declared invalid.

I cannot accept these conclusions as sound in principle. I may, with reference to the first, premise by saying that I do not deny the power of the court to inquire into the constitutionality of an act of the legislature as that power has heretofore been understood and exercised by the courts. While the power has been somewhat vehemently denied, especially within recent years, I am not of the number who have taken that view. The reasoning of Marshall, in the case of *Marbury v. Madison*, 1 Cranch 137, and the reasoning of Webster, in his reply to Hayne, not to mention more recent instances, demonstrate to my mind the existence of the power as conclusively as anything can be demonstrated which is incapable of yardstick measurement. What I mean to deny

is that the question here presented is the question ordinarily presented when it is claimed there is a conflict between an act of the legislature and the constitution. Plainly the questions are not the same. An act of the legislature, as is recalled in the majority opinion, is a rule of action. So, in the same sense, is a provision of the constitution. When, therefore, a rule of action prescribed by the legislature conflicts with a rule of action prescribed by the constitution, and persons whose rights are affected call upon the court to determine which rule of action shall prevail, the court, in determining the question, but exercises its function of determining between the litigants what the law is; it but determines a question of law. But when the legislature enacts a law and declares that the law so enacted is necessary for the immediate preservation of the public peace, health or safety, support of the state government, or its existing institutions, it does not, by the declaration, prescribe a rule of action or enact a law. It but makes an assertion of fact; it but declares that certain facts exist which make it necessary that the rule of action already prescribed by it should take effect earlier than it would otherwise take effect but for the existence of the facts. When, therefore, the court determines whether the declaration is true or untrue, it determines a question of fact, or, at best, a mixed question of law and fact; it determines whether a fact asserted by the legislature does or does not exist.

It is this question of fact that I contend the court is without power to determine. The seventh amendment to the constitution vests the power to determine it in the legislature. It has given the courts no power to pass upon it in review. When, therefore, the court assumes that power, it, in my opinion, usurps its functions. No new principle in legislation is here involved. To make the rights of individuals depend upon certain facts, and vest the power to determine the existence of the facts in some board or person to the exclusion of the courts, is a common practice. Our own de-

cisions furnish abundant instances of it.  For illustration I need but call attention to the cases of *State ex rel. Megler v. Forrest*, 13 Wash. 268, 43 Pac. 51; *Bellingham Bay Imp. Co. v. New Whatcom*, 20 Wash. 53, 54 Pac. 774; *Wiseman v. Eastman*, 21 Wash. 163, 57 Pac. 398; *Lawrence v. Potter*, 22 Wash. 32, 60 Pac. 147; *State ex rel. Abbott v. Ross*, 62 Wash. 82, 113 Pac. 273.  If the legislature may in itself establish a tribunal to determine facts independent of the courts, I see no reason why the people in the constitution may not do so.

But I think the rule laid down for determining the existence of the fact less defensible than the rule permitting an inquiry into the fact's existence.  The constitution does not, in the seventh amendment or elsewhere, require that the facts which give rise to the necessity for the immediate taking effect of an act. be set forth in the body of the act.  It is sufficient, even under the rule of the majority, to raise the inquiry of necessity if the legislature merely makes a declaration of necessity.  It is manifest, therefore, that facts may exist which will give rise to the necessity of an immediate taking effect of an act which are not expressed on the face of the act, and are not of such public notoriety that the courts may take judicial notice of them.  This being true, it seems to me to follow conclusively that the court, under the rule it has adopted, may declare acts not to be emergent which are gravely so and may declare acts to be emergent which have no emergency feature whatsoever.

An illustration may make the point more clear.  Let us suppose that an insurrection exists against the authority of the state, and that the head of the revenue department of the state ("A" for example) is participating therein; that his participation is not generally or publicly known, but is suspected by the highest executive officer of the state, who makes his suspicions known privately to the legislature because some controlling reason exists for not making it publicly known; and that the legislature passes an act which

"says no more than that 'A' shall give place to 'B' " in the revenue department, and "does not show wherein   .   .   . 'A' if continued as a member would incite breaches of the peace or jeopardize the safety of the state, or that the presence of 'B' will give support to the state government." The act would contain all that the constitution requires it to contain, and the gravest necessity would exist for its taking effect immediately, yet the court would, under the rule it has adopted, at the suit of the offending officer, declare the act not emergent.   On the other hand, the officer may be performing his duty loyally, with great ability, yet unfounded rumor, widespread because of the excitement of the times, falsely accuse him of disloyalty.   Should the legislature under these conditions pass an emergency act removing him from office, the court would, under its rule, uphold the act, to the injury of a loyal citizen and to the detriment of the state.

A rule which will work these incongruous results, is, to my mind, in itself dangerous to the state.   The court should either make no inquiry at all, or it should make the inquiry full and complete, even to the taking of testimony when necessary to ascertain the entire truth.

The third rule needs no comment.   It is but the corollary of the other rules, and is unquestionably sound if they are sound.   The existence of the state government, the peace, health and safety of the people, are paramount considerations, and laws passed with the view of their maintenance should be upheld if their validity is only merely doubtful.

But, without further pursuing this inquiry, and passing to the immediate question before the court, it will be observed that the court has determined that each of these five several acts present emergent conditions and that the legislature correctly so declared.   Limited by the rule announced by the majority, I cannot accept these conclusions in their entirety. In my opinion, the act relating to motor propelled vehicles is clearly not emergent.   The act is limited in its operation

to cities of the first class. The emergency declared is "the immediate preservation of the public safety." The act, as shown in the majority opinion, is not regulative in any sense that can be said to be conducive to the public safety. The act does not limit the speed at which the vehicles mentioned may be driven on the streets, it does not limit the number that may be operated, it does not require that the vehicles be run on regular routes or at regular intervals, it contains no provision against overloading, nor does it contain any provision directly designed to secure competency in the individuals who operate them. In fact, the act was not intended to be regulative in this sense. It was intended to provide a solvent fund from which persons injured by the negligent operation of the vehicles could recover damages. There may be a necessity for this, looking at it from the standpoint of the individual, but I am unable to understand how the creation of this fund can, in the remotest degree, contribute to the safety of the state.

The act relating to the division of revenues in cities of the first class, is likewise, in my opinion, not emergent. It was thought by the legislature to be necessary "for the immediate preservation of the public peace, health and safety." It simply prevents cities of the class named from diverting funds collected for one purpose to uses for other and different purposes. The act on its face gives no hint of any danger to the peace, health or safety of the public which makes it necessary that this act take effect immediately; and I confess to being ignorant of any conditions of which I may take judicial knowledge which so make it necessary. I can but conclude, therefore, that the court is in error in holding the act emergent.

The questions suggested and decided in the opinion to which this is attached differ from the questions presented in the opinions just noticed. These relate to clauses in the general appropriation bill, and it is held, as I understand it, that appropriations for the maintenance of the state and the

state institutions are always emergent regardless of any declaration the legislature may make on the question. If this is the rule intended to be announced, I cannot subscribe to it. I think the people have the right of referendum against any act carrying an appropriation, whether for the support of the state and its institutions or otherwise, which is not in fact emergent. On this principle, the fund against which the claim of Blakeslee is presented is clearly not emergent. The others may or may not be so, depending upon facts not disclosed by the record. In my opinion, therefore, only the latter two ought to be held to be emergent.