[No. 30855. Department Two. October 31, 1949.]

VICTOR M. CONAWAY et al., Appellants, v. TIME OIL COMPANY, Respondent.[1]

[1]Reported in 210 P. (2d) 1012.

*Williams & Davis*, for appellants.
*Peyser, Bailey & Cartano*, for respondent.

ROBINSON, J.—This action was brought pursuant to the declaratory judgment statute (Rem. Rev. Stat. (Sup.), §§ 784-1 to 784-17 [P.P.C. §§ 65-1 to 65-33], inclusive). The background of the controversy is shown by the evidence in the case to have been as follows:

In 1946, D. R. Hinkley and wife owned two lots a short distance south of Everett, Washington. They operated, on the lots, a small store, a garage, and a gasoline station in which they retailed gasoline purchased by them from the Time Oil Company, which was represented in the Everett district by C. B. Ward. The Time Oil Company held an option to purchase the Hinkley property, and had advertised it for sale in a Seattle paper. Plaintiff Victor M. Conaway, then a resident of Port Townsend, saw the advertisement, and, upon calling the telephone number given therein, was referred to Ward. Shortly thereafter, Conaway and his wife went to Everett and discussed the matter with Ward, who gave them the location of the property, and they then called on the Hinkleys, examined the property, and were favorably impressed with it. Within the next few days they looked at some other property, and finally decided that the Hinkley property was the best buy. Thereupon they so

notified Ward by telephone and arranged to come to Everett to further discuss the matter.

On August 13, 1946, the Conaways, Ward, and the Hinkleys got together at the Hinkley property, and on that day the Hinkleys sold the property to the Conaways, Ward making that transaction possible by releasing the Hinkleys from the option they had given to the Time Oil Company. Ward, using the Hinkleys' typewriter, typed the Hinkleys' receipt for the earnest money paid to them by the Conaways. Ward had told Conaway, when he first showed him the Hinkley property, that, if he purchased the property, and would purchase and sell Time Oil products, his company would paint the station building, furnish him with certain lights and an illuminated sign, and would pay a portion of the expense of blacktopping around the station. We quote from Conaway's testimony given on direct examination:

"Q. Did he [Ward] ask you if you would sell Time gasoline? A. I don't remember that he did, sir, no. Q. Well, the purpose of the conversation was to get you to sell Time gasoline—the purpose of the conversation was that he was trying to sell you Time gasoline, is that it? A. That's right. Q. What did he tell you that company would do for you if you would sell Time gasoline? A. Well, there was several different conversations about it. I believed that Time Oil Company was an up and coming organization. Q. Just state what he told you, not what you believed. Just state what he told you at the time they would do if you would handle their gasoline? A. Well, that they would make that station look as good as any station in the neighborhood, or fix it up so it would be a presentable place, and that would be a drawing card; and they would give their assistance in modernizing the place and making it so it would look better, so I could sell more of their products. Q. Did he make statements that he would help you do anything concerning the painting of the station, Mr. Conaway? A. Well, yes. The station would be all painted up completely,—an excellent job—and it would be painted completely; have two coats of nothing but the very best grade of paint; they only painted every two years, and used the very best of material, and it would stand up better than the other stations around that got painted once a year. Q. Did he make any statements as to helping you with signs or lights? A. Well, yes. We had

several talks about a hanging illuminated metal sign such as some of the stations do have, that would be put up on the front of the place, and we talked about putting a floodlight on a pole in front of the place so that the place could be seen better at night. And I was led to believe that the station would be fixed up in accordance with the program of other service stations,—they have signs, and things, around identifying the place. Q. You had previously been selling what type of gasoline, Mr. Conaway? A. Been selling Standard. Q. Did he ever tell you he would fix up your station any better than any Standard station? Did he make any statements concerning what Time might do as compared with what other stations might do, or other companies? A. I can't remember the exact conversation, but it was that the place would be fixed up at least as good or better than the other companies were in the habit of doing. Q. Make any statements concerning helping any with blacktopping? A. That's right. He said it had been the practice of the company to pay for half of the black-topping on any stations that sold their products. Q. You finally agreed that you would handle the products, is that correct? A. That's right. Q. When was this paint and facilities agreement first presented to you? A. The first time I saw it was when it was presented to me to sign. Q. When was that? A. That was on August 13th, I believe, '46. Q. Showing you what is marked for identification Plaintiff's Exhibit No. 'A', will you state what that is, please? A. This is a copy of the paint and facilities agreement that I signed. Q. Did you read it at that time? A. I did not. Q. What did Mr. Ward tell you concerning its contents, Mr. Conaway? A. Well, he had four copies of them, I believe, and he said that they were just a matter of form that all stations used, and that I would agree to buy their products, and it was covering the things that we had already discussed about fixing up the place, and so on. Q. Did he ever at any time tell you that it was a lease? A. Never. Q. Did he ever tell you at any time that it had a definite term specified in it? A. No, he didn't. Q. Or that there was any option for renewal in it? A. Absolutely not. Q. Who was present when this was signed? A. Five of us, Mr. and Mrs. Hinckley, and my wife and I, and Mr. Ward. Q. I see that this is signed by Time Oil Company, J. P. Holden. He was not present, then? A. No, sir."

Exhibit "A" is a printed form called "Paint and Facilities Agreement." This instrument was signed by the Conaways,

on their part, and by Ward, for the Time Oil Company, immediately after the Conaways had paid the earnest money to the Hinkleys, and Ward, using the Hinkley typewriter, had filled in some of the blanks in the printed form. The Hinkleys signed it also, under the line "Property Owners' Consent." It was to obtain a declaration of the rights of the parties to this instrument that this action was instituted.

After quoting the "Paint and Facilities Agreement," plaintiffs allege:

"VIII. That it is necessary that the court enter a determination of the rights under said contract and that a decree be entered herein declaring that plaintiffs are not bound by any of the terms and conditions therein and that the same is invalid.

"IX. That a controversy has arisen between the parties hereto as to the respective rights and duties of said parties, and the effect of the aforementioned paint and facilities agreement, and that plaintiff claims the same to be null and void and of no force and effect and to be an invalid lien and agreement."

and prayed for

". . . a declaration of the rights of the parties hereto, including a determination of any and all questions of construction arising under and by virtue of the aforementioned Paint and Facilities Agreement and for their costs and disbursements herein, and for such other and further relief as the court may deem proper."

The so-called "Paint and Facilities Agreement" is very long, containing some twenty paragraphs, and, therefore, cannot be quoted in this opinion. At the trial, the plaintiffs vigorously contended that it should be adjudged to be a lease. They make the same contention in this court, and they have plausible grounds for doing so, although we think them insufficient. They point out that the introductory paragraph of the instrument reads as follows:

"THIS AGREEMENT, made this 13th day of August, 1946, by and between Victor M. and Clara M. Conaway, his wife, hereinafter called 'Lessor,' and Time Oil Company, a corporation, hereinafter known as the Lessee."

and that the first paragraph of the body of the instrument reads as follows:

"1. Lessor grants and leases to Lessee for a period commencing on the 1st day of September, 1946, and ending on the 31st day of August, 1956, and continuing in effect thereafter until canceled by ninety days' written notice from either party of its intention to terminate the lease; the following rights on the hereinafter described premises: . : ."

They further point out that the word "lease" is used fifteen times in the instrument, the word "lessors," twenty-five times, and "lessee," twenty-three times. But the term which is applied to a document by the parties thereto does not necessarily determine the nature of the grant. We quote from *Williams v. Hylan,* 215 N. Y. S. 101, 105, 126 Misc. 807:

"The term which is applied to the document by the parties themselves does not necessarily determine the nature of the grant. The observation of the Court of Appeals in Greenwood L. P. J. R. Co. v. New York & G. L. R. Co., 31 N. E. 874, 875, 134 N. Y. 435, 439, is directly in point:

"'While the instrument creating the right is termed in the body thereof, a "license to use said railroad," this is not conclusive, for the court must look at the nature of the right, rather than to the name that the parties gave it, in order to learn its true character.'"

See, also, *Mehlman v. Atlantic Amusement Co.,* 119 N. Y. S. 222, 223, 65 Misc. 25.

After the "Paint and Facilities Agreement" had been admitted as an exhibit and considerable oral testimony heard, the trial judge said:

"THE COURT: I think the first question here is whether the defendant holds under lease or holds by license. To put it another way, whether the defendant has the rights of a licensee or the rights of a lessee. That can be decided in this cause. Now whether there's been performance or breach is not for this cause, whether it be license or whether it be lease. It is possible that under Section 784-8 that this Declaratory Judgments Act intends that there may be in a proper case some further relief had in a declaratory judgment action. But just what extent of relief that contem-

plates I am unable to say, and it is not necessary for me to say it now.

"As I have indicated, I think the first question in this nature of proceeding that is before me is whether this is equitable or legal, and it will be noted that the statute provides for declaratory judgments and for declaratory decrees —the determination of whether or not Exhibit A is a lease or a license agreement. I have indicated also my earlier views were that it was the last, and as I study it and think of it, I am confirmed in that, that this is a license agreement. If this were an appeal solely to conscience, I would say this is a very harsh agreement. I have to take it by its four corners. The plaintiffs must be held to have executed it knowingly; and when I do thus take it by its four corners, I fail to find in it that which would constitute a lease, nor am I able to find in the dealings of the parties, their actual interpretation of it, that which is consistent with a lease. There is no rental provided. There is no grant to the defendant of the exclusive use and possession of all the premises and facilities. Plaintiffs have occupied the premises and done business in them at all times. The instrument creates a license for a definite period for a consideration, and the rights of the parties to this instrument are those of a licensor and a licensee. The rule that an instrument drawn by a party will be interpreted, where there is ambiguity, most strongly against the one who drew it cannot come into play until, accepting this instrument as an agreement of license, I find there is ambiguity in it as such, and I don't find that here. The language, if this be correctly held an agreement of license, is unambiguous and doesn't call for any interpretation. It is plain. I gather that in its broader aspects the purpose of the entry into this instrument, Exhibit A, on the part of the defendant was to promote its business. It had the right to use exclusively for service station purposes all the facilities that were there and had the right to erect, install and maintain their further facilities. There is no ambiguity about it. However harsh or one-sided this instrument may be, I don't find in it anywhere any express promise or undertaking by the plaintiffs that they will sell only the gasoline designated by the lessee, though such would apparently be implied in Subsection C of Paragraph 2. Nor do I find in it any express promise on the part of defendant to make improvements or add facilities or anything of the kind. But in its broad aspects, as I have said, the defendant sought to promote its business, and gasoline and such were

sold there, and it is to be assumed that added facilities would be afforded, and of course plaintiffs would have the benefit of the use of those added facilities.

"Subdivision *H* of Paragraph 2 provides what shall be the right of the plaintiffs in event the defendants shall fail to perform anything required by it to be done. But I don't see ambiguity in the language. It not being a lease, I have no occasion to pass upon the rights of these parties if it were such."

The trial court entered comprehensive findings of fact and conclusions of law, to the effect (1) that the "Paint and Facilities Agreement" is a license agreement, and that it does not confer on the defendant a leasehold or any other estate or interest in any real property described therein; (2) that the agreement has, at all times since August 13, 1946, been supported by considerations passing between the parties thereto; and (3) that the agreement and all of its provisions are binding upon the respective parties in the action.

In due course, a judgment was entered in which it was ordered, adjudged, and decreed:

". . . that that certain Paint and Facilities Agreement, dated the 13th day of August, 1946, by and between Victor M. and Clara M. Conaway, his wife (the plaintiffs herein), and Time Oil Company, a corporation (the defendant herein) and which is described and set forth in the complaint and answer of the parties hereto, and a signed copy of which was introduced and received in evidence upon the trial of this cause as the plaintiffs' Exhibit 'A' is and has been at all times since its execution by the parties, a valid and subsisting license agreement wherein the plaintiffs are licensors and the defendant is the licensee, and said agreement and each and all of its terms and conditions is and are valid and binding upon the said parties thereto, and none of the terms or provisions of the said agreement is ambiguous or uncertain and none thereof requires construction or interpretation by this court, and the respective rights and obligations of the parties thereto, the plaintiffs and the defendant herein, are fully expressed and declared by the language of said agreement."

After hearing argument on the plaintiffs' motion for a new trial, the trial judge said:

"The instrument that is involved is at least novel in its form. The procedure invoked relative to it is likewise quite novel in this court and before me.

"Since the actual trial and presentation of the evidence in the case, and the presentation and signing of Findings of Fact and Conclusions of Law deemed proper, if not required, I have thought of it a great deal and have attempted through my own investigation to learn whether or not the decision herein and the course of procedure was proper.

"In the end, after all my investigation, I think I find in *Peoples Park etc. vs. Anrooney* [200 Wash. 51, 93 P. (2d) 362], the clearest and most explicit delineation of what it is that the Uniform Declaratory Judgments Act intends a court shall do. And I quote from that case, beginning at the bottom of page 57. . . ."

After quoting at length from the *Anrooney* opinion, the trial judge further said:

"I think that is the best statement of the extent of the remedy by way of declaratory judgment that I have been able to find.

"Accepting that to be what must guide me, if I am correct in having held that this instrument constitutes license rather than lease, I am affording the plaintiffs in the case all the relief that the language of the Supreme Court justifies. I am declaring that the relation between the parties to this instrument and to this litigation is that of licensor and licensee. And, of course, it follows that their rights and their liabilities are those which the law has fixed, and which inhere in that relation of licensor and licensee.

"Here I may say, I have been more confident many times than I am at this time as to whether or not the instrument is one of lease or one of license. But study of this, since the trial, has left me of the same opinion, that this is an instrument of license notwithstanding that the parties who signed it have called it a lease.

"Taken by its four corners and giving every word of it, in the light of the testimony as to the facts and conditions and the status of the property, I still remain of the opinion that it is a license that these parties gave rise to; and it is only when one of these litigants and parties shall attempt to exercise some right which the law recognizes as the right of a licensor or of a licensee, as the case may be, that there will arise any further justiciable question between them for some form of action of civil nature. And I am going to sign

this decree. It is in accordance with the Findings of Fact and the Conclusions of Law that have been signed."

The appellants have made ten assignments of error. However, the bulk of their argument in support of their claims is (1) that the trial court rejected their contention that the "Paint and Facilities Agreement" is a lease, and adjudged it to be a license, and (2) refused to determine, as prayed for, "any and all questions of construction arising under and by virtue of the aforementioned Paint and Facilities Agreement."

In determining whether a written instrument constitutes a lease or a license, the court must consider it in its entirety, together with the circumstances under which it was made and determined and the intention of the parties.

A lease carries a present interest and estate in the property involved for the period specified therein, and requires a writing to comply with the statute of frauds. It gives exclusive possession of the property, which may be asserted against everyone, including the lessor. A license authorizes the doing of some act or series of acts on the land of another without passing an estate in the land and justifies the doing of an act or acts which would otherwise be a trespass. *Barnett v. Lincoln,* 162 Wash. 613, 299 Pac. 392; *Baseball Publishing Co. v. Bruton,* 302 Mass. 54, 18 N. E. (2d) 362, 119 A. L. R. 1518; 32 Am. Jur. 30, § 5; 51 C. J. S. 806, § 202 (2).

Although the "Paint and Facilities Agreement" gives certain exclusive privileges to the respondent, the appellants are not in any way excluded from full possession of the land; nor are their rights under their contract to purchase in any way impaired. We are in accord with the holding of the trial court that the agreement is not a lease, but accorded the relationship of licensors and licensee.

The question was raised at the trial as to whether or not there was any consideration for the agreement, and that question was also raised in this court upon the hearing of the appeal. The trial court held that there was consideration. In view of the fact that we approve the holding of the

trial court that the agreement constituted a license, we think it unnecessary to discuss the question of consideration.

The essential element in the creation of a license is the permission or consent of the licensor. It may be given in writing or by parol; it may be with or without consideration. *Sweeney v. Bird,* 293 Mich. 624, 292 N. W. 506.

"It may be created without more formality than words and acts, may be implied from acquiescence, and requires no consideration." *Tulsa Petroleum Corporation v. Westmoreland,* 180 Okla. 459, 70 P. (2d) 110.

We have said, in *Wiseman v. Eastman,* 21 Wash. 163, 183, 57 Pac. 398:

"'A license,' as defined by Chancellor Kent (3 Kent, Comm. 452), 'is an authority to do a particular act, or series of acts, upon another's land, without possessing any estate therein.' It may be granted by parol, and needs no consideration to support it."

The second of appellants' principal contentions is that the court erred in not passing upon and determining all questions arising under or by virtue of the "Paint and Facilities Agreement." This would have imposed an almost superhuman task on the trial court; for the body of the agreement consists of some twenty paragraphs of legal language.

Our examination of the record convinces us that the appellants asked for, and insisted upon, a broader declaration of rights and more extensive relief than could be justified under the declaratory judgment act, and that the trial judge properly limited the questions to be determined to those raised by actual, specific, justiciable controversies; that is, to actual, as distinguished from potential, disputes. We will hereinafter quote, from appellants' brief, a list of questions to which they insist the trial court should have given an answer, although we find nothing in the record which shows that there was any actual, existing controversy between the parties as to any of the questions which plaintiffs desired the court to answer.

The general character of these questions is revealed by a page in the appellants' brief which reads as follows:

"Assume that appellant sold other products. Could he be enjoined from so doing? Would he be liable in damages?

"Must the land remain idle without compensation to appellant if neither party sells gasoline products?

"May respondent place its own agents on the property to sell gas? If so would there be compensation to appellant?

"Appellant desires to know the answers to these matters so that he may proceed intelligently in the future."

That amounts to an admission by the appellants that they sought an advisory opinion. In construing and applying the act, we have decided that, in order to invoke the jurisdiction of the court under it, there must be an actual, existing justiciable controversy between the parties having opposing interests, which interests must be direct and substantial, and involve an actual, as distinguished from a possible or potential, dispute. The act may not be used for the purpose of obtaining purely advisory opinions from the court. *Acme Finance Co. v. Huse*, 192 Wash. 96, 73 P. (2d) 341, 114 A. L. R. 1345; *Washington Beauty College v. Huse*, 195 Wash. 160, 80 P. (2d) 403; *Peoples Park & Amusement Ass'n v. Anrooney*, 200 Wash. 51, 93 P. (2d) 362; *Brehm v. Retail Food & Drug Clerks Union*, 4 Wn. (2d) 98, 102 P. (2d) 685.

It seems clear to us that the trial court rendered judgment in accordance with the former decisions of this court, above cited.

The declaratory judgment appealed from will stand affirmed. It is so ordered.

SCHWELLENBACH and GRADY, JJ., concur.

SIMPSON, C. J., concurs in the result.

December 13, 1949. Petition for rehearing denied.