[No. 57499-5.   En Banc.   September 5, 1991.]

DRAPER MACHINE WORKS, INC., *Respondent*, v. THE DEPARTMENT OF NATURAL RESOURCES, *Appellant*.

*Kenneth O. Eikenberry, Attorney General,* and *Christa L. Thompson, Assistant,* for appellant.

*Gail E. Mautner, Michael L. Cohen, Michael B. King, Paul D. Swanson,* and *Lane Powell Spears Lubersky,* for respondent.

BRACHTENBACH, J. — The issues in this case concern the Department of Natural Resources' statutory authority to collect rent for use of state-owned waterways and Draper Machine Works' right to maintain a marina in such a waterway. The trial court concluded the Department of Natural Resources (DNR) has no authority to enter into rental agreements for use of waterways and therefore declared void a lease of waterway between Draper Machine Works (respondent) and DNR. It further held that respondent has an equitable right to occupy the

waterway and therefore entered a summary judgment order to that effect in favor of respondent. We reverse and remand.

In 1896 respondent's predecessor bought uplands (land above high tide) and tidelands (lands between ordinary high and extreme low tide) from the State. These lands were located on the south side of Salmon Bay. Salmon Bay is a body of water that runs generally east-west between Puget Sound on the west and Lake Union on the east. At that time, Salmon Bay was connected to Puget Sound. *See Bilger v. State*, 63 Wash. 457, 460, 116 P. 19 (1911). Respondent's predecessor's tidelands extended north, out to a waterway line which had been established in 1894. On the other (north) side of the waterway line was the Salmon Bay waterway which had been established by the State to provide unimpeded navigation through the bay. Coterminous with the waterway line was a federal pierhead line which was established at essentially the same time and served essentially the same function as the waterway line relative to unimpeded navigation. This unimpeded navigation was necessary because the state and federal governments had decided to run the Lake Washington Ship Canal through Salmon Bay and Lake Union.

The ship canal was eventually completed and in 1949 the federal government moved the federal pierhead line north of its prior location, so that the federal pierhead line was no longer coterminous with the state waterway line. The federal government does not dredge landward of its pierhead lines. 33 U.S.C. § 628 (1988). This left a stretch of waterway between the waterway line and the federal pierhead line (referred to herein as the intervening waterway) which was no longer being dredged and which was no longer considered by the federal government to be necessary for navigation in the ship canal.

Respondent, which had purchased the abutting tide-lands[1] and uplands from its predecessor in 1945, sought to purchase this intervening waterway area in 1957. The State refused to sell. In 1959 respondent tried again, this time seeking to lease the intervening waterway. The State, through DNR, agreed and entered into a 10-year "lease" of "unplatted tidelands" with respondent which was renewed in 1969. This renewal expired in 1984. Respondent has constructed boat moorage facilities on its own tidelands and on this intervening area of the water-way (mostly on the waterway).

In 1979 DNR sought an increase in rent to bring the rent for the intervening waterway up to fair market rental. Respondent objected, stopped paying rent, and filed an action in 1980 seeking quiet title to the interven-ing waterway and return of rent "wrongfully" paid to DNR. DNR counterclaimed seeking to compel respondent to pay its rent, and moved for summary judgment dis-missal of respondent's claim. In 1983 the King County Superior Court granted partial summary judgment to DNR, holding that the State, not respondent, owned the intervening waterway. The only issue left open was DNR's counterclaim for unpaid rent.

In 1984, respondent filed a "Reply and Request for Additional Relief". In this pleading it asserted, ostensibly as defenses to DNR's counterclaim, additional rights to relief which had not been pleaded in its original com-plaint. Namely, it asserted that it had an equitable "right

---

[1]The parties characterize the land immediately adjacent to the waterway as "tidelands". To qualify under the statutes as tidelands, the property must underlie tidally influenced water. RCW 79.90.030, .035. Before construction of the ship canal, Salmon Bay was attached to Puget Sound and the land in question was therefore properly classified as tidelands. Construction of the Ballard locks, however, raised the water level in Salmon Bay and made that level constant. Thus, the property adjacent to the waterway no longer meets the technical definition of "tidelands". However, because the proper definition of this land is not necessary for determination of this case and the issue has not been addressed by the parties, we do not decide whether this land is properly considered tidelands or shorelands (see RCW 79.90.040, .045). Rather, we assume, as do the parties, that the land adjacent to the waterway is "tidelands".

of access" across the waterway under *Commercial Water-
way Dist. 1 v. Permanente Cement Co.*, 61 Wn.2d 509,
512-13, 379 P.2d 178 (1963), which in effect gave it the
right to occupy the waterway with its moorage slips. It
also asserted that the "leases" it had entered into with
DNR were not authorized by statute and were therefore
void. It therefore again sought return of the rent it had
already paid DNR.

In 1990 respondent moved for summary judgment on
these grounds, and also sought denial of DNR's counter-
claim for unpaid rent. DNR filed a cross motion for sum-
mary judgment on the "right to occupy" issue. The trial
court granted respondent's motion and denied DNR's. In
granting respondent's motion, however, the trial court
only allowed respondent to recover the rent it had paid for
the 3 years prior to 1984. This was because the court felt
the action to recover the improperly paid rent was an
action on an unwritten contract and therefore covered by
the 3-year statute of limitations, and respondent's claim
for refund of the improperly collected rents dated from the
1984 "Reply and Request for Additional Relief" rather
than the 1980 complaint.

DNR appealed the trial court's decision as to the inva-
lidity of the lease and respondent's "right of access".
Respondent cross-appealed the trial court's application of
the 3-year statute of limitations and its use of 1984 as the
date from which the statute began to run. Certification to
this court was accepted.

The parties raise a number of issues. Because of our
disposition of this case, however, we need only address
two of them: whether DNR has authority to collect rent
under RCW 79.93.010 and .040, and whether respondent's
"right of access" claim is properly before us on the facts of
this case. Both of these questions are questions of law
which we review de novo on appeal of a summary judg-
ment order. *DuVon v. Rockwell Int'l,* 116 Wn.2d 749, 753,
807 P.2d 876 (1991).

## I
## DNR's Authority To Collect
## Rent: RCW 79.93.040

Respondent argues that RCW 79.93.010 precludes DNR from collecting rent for respondent's occupation of the disputed portion of the waterway. RCW 79.93.010 provides in pertinent part:

> It shall be the duty of the department of natural resources simultaneously with the establishment of harbor lines and the determination of harbor areas in front of any city or town, or as soon thereafter as practicable, to . . .
> . . . establish one or more public waterways not less than fifty nor more than one thousand feet wide, beginning at the outer harbor line and extending inland across the tidelands belonging to the state. These waterways shall include within their boundaries, as nearly as practicable, all navigable streams running through such tidelands, and shall be located at such other places as in the judgment of the department may be necessary for the present and future convenience of commerce and navigation. *All waterways shall be reserved from sale or lease and remain as public highways for watercraft until vacated as provided for in this chapter.*

(Italics ours.)

DNR counters with RCW 79.93.040, which provides in pertinent part:

> If the United States government has established pierhead lines within a waterway created under the laws of this state at any distance from the boundaries established by the state, structures may be constructed in that strip of waterway between the waterway boundary and the nearest pierhead line *only with the consent of the department of natural resources and upon such plans, terms, and conditions and for such term as determined by the department.* However, no permit shall extend for a period longer than thirty years.
> The department may cancel any permit upon sixty days' notice for a substantial breach by the permittee of any of the permit conditions.
> If a waterway is within the territorial limits of a port district, the duties assigned by this section to the department may be exercised by the port commission of such port district as provided in RCW 79.90.475.

(Italics ours.) DNR contends that rent is one of the "terms and conditions" allowed for by RCW 79.93.040.

▮▮ To resolve this apparent conflict between statutes, we must attempt to give effect to the Legislature's intent in enacting them, as expressed in the statutes. *Martin v. Meier*, 111 Wn.2d 471, 479, 760 P.2d 925 (1988). We also must attempt to read the two statutes so as to give each effect and to harmonize each with the other. *Avlonitis v. Seattle Dist. Court*, 97 Wn.2d 131, 138, 641 P.2d 169, 646 P.2d 128 (1982).

In order to understand the legislative intent in enacting these two statutes, it is necessary to put this dispute in the context of the larger picture of the State's overall management of its aquatic lands. Washington, unlike most states, claims absolute fee simple ownership of the land underlying its waters. Const. art. 17, § 1; *Port of Seattle v. Oregon & Wash. R.R.*, 255 U.S. 56, 64, 65 L. Ed. 500, 41 S. Ct. 237 (1921); *Davidson v. State*, 116 Wn.2d 13, 16, 802 P.2d 1374 (1991). This land is divided into a number of categories, depending on the land's location and function.

Tidelands are lands located under tide-influenced water, between the line of ordinary high and extreme low tides. RCW 79.90.030, .035. Shorelands are basically the freshwater equivalent of tidelands. RCW 79.90.040, .045. Both shorelands and tidelands, while originally owned by the State, can usually be sold and leased to individuals. RCW 79.90.090, .100. The general rule is that lands lying waterward of shorelands and tidelands cannot be sold or leased.

Harbor areas are areas reserved for wharves and other conveniences of navigation. Const. art. 15, § 1; RCW 79.90.020. They are designated by an outer harbor line, which is in water deep enough to accommodate the largest ships anticipated to use the harbor, and an inner harbor line, which is usually contiguous with the line of navigability. Const. art. 15, § 1; RCW 79.90.015, .025. Harbor areas are exceptions to the general rule, in that the State may lease, but may not sell, the land underlying

this navigable water. Const. art. 15, §§ 1, 2. The maximum term of such lease is 30 years. Const. art. 15, § 2; RCW 79.92.060. No sale, lease, or development is allowed waterward of the harbor area. *Davidson v. State, supra* at 16.

Waterways are areas within harbor areas where development and building is not generally allowed. RCW 79.93.010. In essence, they are water streets allowing access from the deep water outside the harbor to the wharves and docks built within the harbor. RCW 79.93.010 could be interpreted as requiring waterways to be within a harbor area. Because no harbor lines have been created in the ship canal, this would seem to create an issue as to whether the waterway at issue here was ever validly created. However, both parties agree that it was validly created, so the issue is not before the court.

Overlaid on this state harbor system is the federal harbor system. Of particular importance here is the federal "pierhead" line. The pierhead line is the line waterward of which no construction can take place without a federal permit and landward of which no federal money can be spent to dredge. 33 U.S.C. §§ 404, 423, 424, 628 (1988). It is therefore analogous to the waterway line for purposes of maintaining navigability, although, as is evident from this case, it need not be established coterminously with the waterway line.

In view of this statutory scheme, the purpose of RCW 79.93.010 and .040 is obvious. Both statutes work together to protect and maintain certain areas as "water highways"; to prevent development from encroaching into those highways and choking off navigation and commerce. This is the purpose behind RCW 79.93.010's reservation of waterways from sale or lease. RCW 79.93.040 merely acts as a proviso to this reservation. In it the Legislature recognized that the federal pierhead line serves essentially the same function as the waterway line for navigational purposes. Both exist to ensure navigable "avenues" of open water. Therefore, if a pierhead line exists water-

ward of a waterway line, the intervening waterway *can be* built on because the pierhead line continues to protect navigability. In fact, respondent *relies* on this aspect of RCW 79.93.040, otherwise it could not have built its moorage in the disputed waterway area.

Nevertheless, respondent maintains that although RCW 79.93.040 allows *building* in the intervening waterway area, it does not allow rent to be charged for the use of that area. This, respondent argues, is because RCW 79.93.010 does not allow waterways to be "leased" and RCW 79.93.040 does not expressly provide for collection of rent for use of waterways.

██ This is a strained and unrealistic interpretation of the statute and we do not accept it. *See Cherry v. Municipality of Metro Seattle*, 116 Wn.2d 794, 802, 808 P.2d 746 (1991). While RCW 79.93.040 may not contain the word "rent" in its provisions, it does state that DNR will set the "terms and conditions" upon which any building will take place within a waterway. We consider rent to be one of these "terms and conditions". Moreover, respondent has supplied us with no believable reason why the Legislature would allow use of the waterway without also allowing for collection of rental for that use. We likewise have been unable to envision such a justification, especially in light of the legislative declaration that generation of revenue from state-owned aquatic lands is a "public benefit". RCW 79.90.455.

We therefore read RCW 79.93.010 and .040 together to provide that waterways may never be sold or leased, but where they lie landward of a federal pierhead line they may be put to use and rental may be charged for that use.

Examination of the legislative history of RCW 79.93-.040 supports this interpretation of the statutes. The predecessor to RCW 79.93.040 is found in Laws of 1913, ch. 168, § 1, which provided "no structure shall be allowed in the strip of waterway between the boundary and the nearest pierhead line except by the consent of the state land commissioner [later the Department of Natural

Resources] and upon plans approved and terms and conditions fixed by him". The statute did not explicitly state that rent could be collected from a permittee, but did provide a method for computing the rental to be received from the permittee and noted that after 1928 the rent would be fixed by the public authority in charge of the waterway. The statute also provided for a fidelity bond to be paid by the permittee to insure payment of rent. Finally, the statute provided that where the waterway was within the jurisdiction of a port district, the port district would assume the duties of the land commissioner and, in general, 75 percent of the rent received from the use of the waterway would go to the port district, with the other 25 percent going to the State. The statute therefore contemplated that the "terms and conditions" which could be imposed by the authority in charge of the waterway included rent.

This was the law until 1982, 3 years after respondent stopped paying its rent. That year, Laws of 1913, ch. 168, § 1 was repealed and replaced by Laws of 1982, 1st Ex. Sess., ch. 21, § 83. This statute took out the language of the 1913 act relating to the method of computing rental, but kept the bond provision which stated that "[t]he bond shall secure the payment of the rental reserved in the permit . . .." It therefore appears that charging rent was still authorized. The probable explanation for the deletion of the rent-fixing language of the 1913 act is that by the terms of that act, after 1928 the setting of rent was entirely within the discretion of the authority in charge of the waterway, so the language was superfluous. In fact, the 1982 act made quite clear that rent still *could* be collected for the use of waterways.

> From the effective date of this 1982 amendatory act, until July 1, 1983, the annual *rental fee* for an existing *lease*, and renewal *lease* or re-*lease* of tidelands, shorelands, beds of navigable waters, *waterways* and harbor areas shall not increase at a rate of more than six percent per year . . ..

(Italics ours.) Laws of 1982, 1st Ex. Sess., ch. 21, § 176.

RCW 79.93.040 was amended to its present form by Laws of 1984, ch. 221, § 21. This statute cleaned up the language of the prior act and also made some substantive changes. It took out the reference to the security bond and deleted the language relating to the distribution of rental proceeds between the state and the port district, referring the reader instead to § 6 of the 1984 act (RCW 79.90.475). RCW 79.90.475 is a new section providing for division of duties between the Department of Natural Resources and port districts as to *all aspects* of operation of a harbor area. It contains language relating to distribution of rents between the state and the port district. Likewise, a new section was added by the 1984 act allowing DNR to require a bond securing rent for leases of *all* aquatic lands extending beyond 1 year. Laws of 1984, ch. 221, § 16 (RCW 79.90.525).

Thus, it appears that the bond and rent distribution sections of former RCW 79.93.040 were taken out to avoid redundancy with the new uniform sections dealing with the same subjects. This assumption is buttressed by reference to the statutes dealing with harbor areas. These statutes also evidence a pattern of omission of language which might be redundant with the newly created uniform sections. *Compare* Laws of 1982, 1st Ex. Sess., ch. 21, §§ 73, 79, *with* Laws of 1984, ch. 221, § 25, p. 1129. Moreover, there is nothing in the 1984 act indicating the Legislature's intent to affect DNR's ability to collect rent under RCW 79.93.040. Such an intent should not be imputed to the Legislature, unless expressly stated, in light of RCW 79.90.455's statement that generation of revenue from state aquatic lands is a public benefit.

Respondent, however, contends that because RCW 79.93.010 "reserves" waterways from sale or lease, those waterways are no longer "public lands" as defined by RCW 79.01.004. Respondent then cites *Commercial Waterway Dist. 1 v. Permanente Cement Co.*, 61 Wn.2d 509, 512-13, 379 P.2d 178 (1963) and *Laurelhurst Club, Inc. v. Backus*, 161 Wash. 185, 191, 296 P. 819 (1931) for

the proposition that such "reserved" lands are held by the State solely in its sovereign capacity, not in its proprietary capacity, and cannot therefore be alienated.

■ The first problem with this argument is that the State is not "alienating" the disputed waterway in this case. It is merely granting a permit for use and charging rent for that use. Title has not changed hands.

The second problem is that neither of the cases cited by respondent dealt with the effect of RCW 79.93.040 on RCW 79.93.010. They were dealing solely with .010, which clearly *does not* allow any private use of public waterways other than for navigation. As already shown, the Legislature intended RCW 79.93.040 to apply in conjunction with RCW 79.93.010 as to waterways located between waterway lines and pierhead lines and therefore supersedes the analysis in the cases cited by respondent.

Moreover, the reason such "reserved" lands are not held by the State in its proprietary capacity is because they must remain in state hands. In the case of waterways, they must remain in state hands because they must remain open for navigation. As respondent points out, the State holds these lands in trust for the public. However, in RCW 79.93.040, the Legislature has recognized that when a pierhead line is waterward of a waterway line, the portion of the waterway between the lines no longer must be kept open to provide a public benefit. The public trust no longer requires that it be kept open under such conditions. Thus, respondent was allowed to build its moorage facilities. Respondent has given no reason, other than its somewhat Byzantine "reservation" argument, why the public trust requires the State to allow free use of its waterway by a private individual for that individual's own commercial benefit.

Finally, respondent's argument relating to "reservation" and sovereign and proprietary capacities only obscures the real point of the inquiry: Whether the Legislature intended in RCW 79.93.040 to allow DNR to collect rent for the use of certain portions of waterways. If it did so

intend, the only way respondent can overcome the statute is with an argument that it is unconstitutional. It has not attempted to do so and the statute therefore stands.

Respondent appears to make one final argument relative to the legality of DNR's collection of rent. It argues that since the document in question is called a "lease of tidelands" rather than a "permit to use waterways" the "lease" is void.

To begin with, respondent does not contend that the "lease" in question does not meet the statutory requirements of RCW 79.93.040. Rather, respondent seems to contend (1) that because it is called a "lease" rather than a permit, it is void, and (2) that because the parties intended to lease tidelands (under a statute other than RCW 79.93.040) rather than permit use of a waterway, there was no meeting of the minds as to the subject matter of the contract and therefore no contract was created. Respondent could therefore be interpreted as seeking rescission under the theory of mutual mistake.

■ As to respondent's first contention, DNR correctly points out that " '[t]he term which is applied to the document by the parties themselves does not necessarily determine the nature of the grant." Rather, "the court must look at the nature of the right, rather than to the name that the parties gave it, in order to learn its true character." ' " *Conaway v. Time Oil Co.*, 34 Wn.2d 884, 889, 210 P.2d 1012 (1949) (quoting *Williams v. Hylan*, 215 N.Y.S. 101, 105, 126 Misc. 807, *aff'd*, 217 A.D. 741, 216 N.Y.S. 936 (1926)). As already noted, the area in question is a waterway and the instrument by which respondent is allowed to use it qualifies as a permit under RCW 79.93.040. Therefore, the fact that the document was called a "lease" rather than a permit does not defeat its validity, especially in light of the fact that the Legislature itself has referred to a permit for the use of a waterway as a "lease". *See* Laws of 1982, 1st Ex. Sess., ch. 21, § 176. To hold otherwise would elevate form over substance.

■ Respondent's mutual mistake challenge also fails. The equitable doctrine of mutual mistake allows rescission of a contract if the "mistake of both parties at the time a contract was made as to a *basic assumption* on which the contract was made has a material effect on the agreed exchange of performances . . .." (Italics ours.) *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 899, 691 P.2d 524 (1984) (quoting Restatement (Second) of Contracts § 152 (1981)), *cert. denied*, 471 U.S. 1065, 1075 (1985). The "basic assumption" in this case was not whether DNR had authority under the statute referred to in the lease to lease the land in question, but whether it had the authority at all. *See Chemical Bank*, at 899. The parties entered into the lease based on such an assumption and, as already shown, DNR in fact had such authority. Therefore, the doctrine of mutual mistake is of no assistance to respondent. Even if respondent could use the doctrine to rescind the contract, it would have to return the value of any enrichment it received but did not pay for, under the equitable doctrine of restitution or unjust enrichment. *See Chemical Bank*, at 904-05, 910. Therefore, even if there were a mutual mistake, respondent would owe DNR its unpaid rent, or something closely approximating it.

■ Finally, respondent repeatedly asserts that DNR has publicly admitted that it cannot lease waterways. Respondent seems to want to use this "fact" to estop DNR from claiming such a lease is legal. See Brief of Respondent/Cross-Appellant, at 50-51. Even assuming a misstatement of law could form the basis of an estoppel argument, respondent has not shown how it justifiably relied to its detriment on such admissions. *See Board of Regents v. Seattle*, 108 Wn.2d 545, 551, 741 P.2d 11 (1987) and cases cited therein. As a result, DNR is not estopped from claiming the "lease" at issue here was legal.

## II
### RESPONDENT'S "RIGHT OF ACCESS" CLAIM

Respondent argues that even if DNR does have the statutory authority to collect rent for use of certain waterway areas, it cannot collect rent in this case. Respondent acknowledges that it has no riparian right to occupy the disputed waterway area. *See Eisenbach v. Hatfield*, 2 Wash. 236, 26 P. 539 (1891). Respondent nevertheless argues that it would be inequitable not to allow it to use the disputed waterway area to gain access to the deep water represented by the federal pierhead line. It claims that its moorage slips are necessary to insure this "right of access" and therefore claims that it should be able to maintain the slips in the waterway rent free. It relies for this argument almost exclusively on *Commercial Waterway Dist. 1 v. Permanente Cement Co.*, 61 Wn.2d 509, 512-13, 379 P.2d 178 (1963).

*Permanente* arose out of the dredging of state tidelands to create the Duwamish Waterway pursuant to Laws of 1911, ch. 11. In order to create the waterway, Commercial Waterway District No. 1 of King County (District) acquired by purchase and condemnation a right of way 500 feet wide. When the waterway was created in 1915, it was dredged to its full 500-foot width. After 1924, the United States Army Corps of Engineers took over dredging and only dredged the channel to a 250-foot width. *Permanente*, at 510-11.

Permanente Cement Company (Permanente) bought some upland property abutting the waterway in 1946. It requested and received permission from the Army Corps of Engineers to dredge certain parts of the waterway and construct a dock and loading facilities there in order to gain access to the dredged channel. It needed such access because the ships which would load and unload there would exceeded 400 feet in length. Permanente did not seek permission from the District and the District did

nothing to stop Permanente from its dredging and building. *Permanente*, at 511.

However, in 1959, 13 years later, the District asserted a right to collect rent for Permanente's use of the waterway and offered to lease the portion of the waterway which Permanente's dock occupied to Permanente. Permanente argued (1) that it had title to the waterway through adverse possession, (2) if not, it still had a right to occupy the waterway, and (3) the District could not collect rent for Permanente's occupation of the waterway. *Permanente*, at 511-12.

A department of the court held that Permanente did not own the waterway through adverse possession because adverse possession does not operate against the State as to lands it holds in its sovereign capacity. *Permanente*, at 512-13. It did hold, however, that Permanente had a right of access to the dredged portion of the waterway based on the equities of the case, and that the District could not charge rent for Permanente's possession of the waterway. *Permanente*, at 521, 524.

██ We begin our analysis by noting that *Permanente* was decided by a department of this court, with only three judges concurring in much of the opinion's analysis. *See Harris v. Hylebos Indus., Inc.*, 81 Wn.2d 770, 781, 505 P.2d 457 (1973). Also, the *Permanente* decision was based on unique facts and equities. As we stated in *Harris*, at 784, the *Permanente* decision was "extraordinary" and "demanded by its peculiar facts." Also, much of the relevant analysis in *Permanente* was limited to addressing the particular, unique, statute at issue in that case, Laws of 1911, ch. 11, not the general statutes at issue in this case. Thus, the *Permanente* decision is limited to the facts and law of that case. Respondent nevertheless contends that it should get the benefit of the *Permanente* analysis because the present case presents almost identical facts. Respondent is wrong.

The court in *Permanente* decided that Permanente Cement Company had a right of access across the Duwamish Waterway and decided that the dock which Permanente had built was necessary to facilitate that access. *Permanente*, at 516, 518. It therefore held that the District could not prevent Permanente from maintaining the dock in the waterway. Respondent claims that its boat moorage is also necessary to guarantee it access and therefore requests that we find it has a right of access.

Moorage is not necessary for respondent to gain access to the dredged ship canal and therefore we need not decide the access issue. DNR's attempts to collect rent from respondent for its occupation of the state-owned waterway do not in any way threaten respondent's access to the dredged canal because respondent would have access from its property to the dredged canal whether the marina was there or not.

The "dock and loading facilities" at issue in *Permanente* are different than the moorage slips at issue here. The court in *Permanente* accepted as a fact that Permanente's dock was necessary for it to have access to deep water. The dock in *Permanente* was used to gain access from Permanente's uplands and tidelands, across the intervening waterway, and out to the large ships which could not come out of the deep water of the dredged waterway. This is what "access" meant in that case and the dock was necessary to insure that access. In this case, however, respondent is not asserting its need to go out to the deep water to meet the large ships. Rather, respondent's business *requires* that boats *come out of the deep water* and into its moorage slips. "Access", therefore, relates to respondent's ability to get boats from its own property to the deep water of the ship canal and vice versa. Respondent's moorage slips are not necessary for this purpose. They do not facilitate the boats' travel, but rather act as storage space for the boats. If anything, the slips

located in the intervening waterway get in the way of the boats moored on respondent's own property.

Because the right to maintain the moorage slips is the only thing at issue here and since the moorage slips are not necessary for respondent's access to the deep water, the right of access issue is not now properly before this court. In other words, we will not decide whether respondent has a right of access across the intervening waterway because respondent has failed to show how a decision adverse to it in this case will deprive it of access.

Respondent, however, repeatedly asserts that if DNR were allowed to terminate its lease with respondent and lease the intervening waterway to a third person, respondent would be entirely deprived of access to the dredged canal. Brief of Respondent/Cross-Appellant, at 5 (citing Clerk's Papers, at 417-19, 470 (affidavits of Charles D. Draper, Sr.)). Respondent's unsubstantiated assertions are inadequate to raise an issue regarding possible future action by DNR. Respondent has shown no facts indicating that DNR plans to terminate respondent's lease or lease to a third party. The fact that DNR has persisted in this litigation and has put up with respondent's nonpayment of rent since 1979 would seem to indicate just the opposite.

Moreover, respondent has not shown how such a lease to a third party *would* entirely cut off its access. This could only be determined in the context of an actual case where DNR had actually entered into such a lease or had indicated its intention to do so and where the terms of the proposed lease clearly specified how much of the waterway was to be leased and to what use it would be put. These are not the facts of this case. The access issue, if not entirely meritless, is not yet ripe for review and we will not decide it.

Nevertheless, counsel for respondent noted at oral argument that respondent *must* have a right of access because DNR has admitted as much in its reply brief. Respondent is correct in noting that DNR has conceded

this point. See Reply Brief of Appellant, at 13. We nonetheless refuse to decide an issue which is not properly before us based on one ill-considered sentence in a reply brief.

We therefore hold respondent's marina is not necessary to facilitate any "right of access" it may or may not have. *Permanente* is inapplicable. DNR may charge respondent rent for its use of the state-owned waterway. We therefore reverse the trial court's grant of summary judgment for respondent and remand. The trial court is directed to enter partial summary judgment in favor of DNR. Respondent must pay DNR back rent, plus interest for its use of the waterway. We leave to the trial court the factual question of the amount of rent and interest owed.

DORE, C.J., and UTTER, DOLLIVER, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

Reconsideration denied November 14, 1991.